# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and AMERICAN HOME ASSURANCE COMPANY, | Civil No. 10-4948 (JRT/AJB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| DONALDSON COMPANY, INC. and FEDERAL INSURANCE COMPANY, | |
| Defendants. | |

Cody S. Moon, Kelly L. Stoltz, and Matthew J. Fink, **BATES CAREY NICOLAIDES LLP**, 191 North Wacker Drive, Suite 2400, Chicago, IL 60606; and Nicholas H. Jakobe and Patrick D. Reilly, **ERSTAD & RIEMER, P.A.**, 8009 34th Avenue South, Suite 200, Minneapolis, MN 55425, for plaintiffs.

Bradley M. Orschel, Gary J. Haugen, and Margaret S. Brownell, **MASLON EDELMAN BORMAN & BRAND, LLP**, 90 South 7th Street, Suite 3300, Minneapolis, MN 55402, for defendant Donaldson Company, Inc.

Beth A. Jenson Prouty, Curtis D. Ruwe, and Lindsay G. Arthur, Jr., **ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, PA**, 81 South 9th Street, Suite 500, Minneapolis, MN 55402-3214; and Daniel J. Cunningham, **TRESSLER LLP**, 233 South Wacker Drive, Chicago, IL 60606, for defendant Federal Insurance Company.

Plaintiffs National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and American Home Assurance Company ("American Home") bring this action against their insured, Defendant Donaldson Company, Inc. ("Donaldson"), and

Donaldson's excess insurer, Defendant Federal Insurance Company ("Federal"). Plaintiffs seek to recover amounts that they contributed to a settlement on behalf of Donaldson. Donaldson argues that Plaintiffs may not recover their contribution to the settlement because of estoppel and because Plaintiffs' insurance policies required their contribution to the settlement. Federal argues that Plaintiffs cannot seek reimbursement because of waiver, estoppel, accord and satisfaction, and judicial estoppel. Federal has requested judgment on the pleadings, and all parties have filed motions for summary judgment or partial summary judgment. The Court will deny all of the motions because, among other reasons, the parties have completed little discovery and the summary judgment motions are premature.

## BACKGROUND

Throughout the 1990s, Donaldson designed and manufactured plastic air-intake ducts for the air-intake system on trucks manufactured by Western Star Trucks ("Western Star"). (First Decl. of Margo S. Brownell, Ex. 2 at Vol. II-39, May 2, 2011, Docket No. 17; Donaldson Countercl. ¶ 76, Docket No. 8.) These trucks were used in the logging and construction industries. (Donaldson Countercl. ¶ 76.) The purpose of an air-intake system for diesel trucks is to deliver clean air into the internal part of the engine. (First Brownell Decl., Ex. 2, at I-131.)

Donaldson made its air-intake ducts out of plastic. (*Id.* at II-16.) Molding machines created the ducts. (*Id.* at II-16-17.) The machines poured a premeasured amount of ground resin into the molds in a dry form. (*Id.* at II-17.) The molds then

closed, rotated, and entered an oven that melted the resin.  (*Id.* at II-18-20.)  After the resin cooled, the air-intake ducts were removed from the molds.  (*Id.* at II-21.)

Donaldson created more than one type of duct, including a "crossover" duct and a "45-degree" or "elbow" duct.  *(Id.* at I-176, II-13-15, II-41, II-153; Second Decl. of Margo S. Brownell, Ex. 2, at 7, June 29, 2011, Docket No. 48.)  The ducts were produced at a plant in Iowa and, later, a plant in another state.  (First Brownell Decl., Ex. 2, at II-38-41.)  According to Donaldson, the plastic air-intake ducts were manufactured with the same molds and processes at both plants, but Plaintiffs and Federal dispute this claim.

### A.    Legal Action Regarding Air-Intake Ducts

Starting in 2001,[1] purchasers of Western Star trucks began filing lawsuits against Donaldson alleging that the air-intake ducts it designed and manufactured possessed insufficient wall thickness, which allegedly caused the ducts to soften and melt.  (First Brownell Decl., Ex. 3, at 323; Donaldson Countercl. ¶ 78.)  The melting of the ducts allegedly caused "engine dusting" and the failure of engines in some trucks.  (Donaldson Countercl. ¶ 78.)  A "dusted engine" is an engine that has ingested unfiltered air into the combustion chamber.  (First Brownell Decl., Ex. 3, at 134.)  This dusting can destroy the engine's rotating assemblies.  (*Id.* at 134.)

On November 8, 2001, fifteen purchasers of Western Star trucks filed *Ortho Arender v. Burroughs Diesel, Inc.* in Mississippi state court against Burroughs Diesel,

---

[1] On November 1, 2001, a purchaser of Western Star trucks filed *Sammie Bonner Construction Company, Inc. v. Western Star Trucks et al.*, against Western Star and Donaldson in Alabama state court.  (Donaldson Countercl. ¶ 79.)

Inc. ("Burroughs"), Donaldson, and Western Star, alleging that the Western Star trucks they purchased were inoperable due to the air-intake system. (First Decl. of Matthew J. Fink, Exs. J, K, June 1, 2011, Docket No. 32; Donaldson Countercl. ¶¶ 81-82.) Burroughs, a commercial dealer of Western Star trucks, filed a cross-claim against Donaldson alleging the premature failure of engines due to the air intake system ("the Burroughs cross-claim"). (Donaldson Countercl. ¶¶ 77, 83.)

Burroughs sold "a couple of hundred" Western Star trucks starting in 1989. (First Brownell Decl., Ex. 3, at 160.) The trucks at issue in the Burroughs cross-claim appear to have been Western Star Heritage model trucks sold from 1989 to 1999. (*See* Second Brownell Decl., Ex. 2, at 2.) Burroughs alleged that a problem with Donaldson's 45-degree duct damaged approximately seventy-five to one-hundred of its trucks. (First Brownell Decl., Ex. 3, at 160.) Burroughs further alleged that problems with Donaldson's crossover duct damaged fourteen to fifteen of its trucks. (*Id.* at 161.) Donaldson asserts that, regardless of the particular duct used, the engine failures allegedly arose from the same design defect.

Purchasers of Western Star trucks filed several other legal complaints against Donaldson for similar problems. All of these cases eventually settled. As of March 11, 2008, the Burroughs cross-claim was the only outstanding complaint against Donaldson regarding its air-intake ducts. (Donaldson Countercl. ¶ 86.)

## B.   Notice to Donaldson

The record demonstrates that Donaldson employees likely received notice of problems with their air-intake ducts in 2000.[2]  Specifically, the evidence suggests that on August 9, 2000, Donaldson's Quality Manager Doug Flemming identified a potential problem with an air-intake duct in a Western Star truck sold by Burroughs.  (*See* Second Brownell Decl., Ex. 4.)  However, Martin Kohne, the Risk Manager for Donaldson, appears to have first learned of problems with air-intake ducts installed in Western Star trucks around November 2001, when he received a copy of a court complaint.  (Decl. of Martin R. Kohne ¶ 7, April 29, 2011, Docket No. 18.)

## C.   Insurance Policies

### 1.   Commercial General Liability Policies

Plaintiffs insured Donaldson from 1996 to 2002, with largely identical insurance policies.  Plaintiffs are separate insurance companies owned by the same parent company.  National Union issued four commercial general liability ("CGL") policies to Donaldson, effective for consecutive annual periods from July 31, 1996 to July 31, 2000.[3]  American

---

[2] Plaintiffs claim that, as early as October 28, 1994, Donaldson designed a supplemental product as a fix for its defective air-intake ducts.  (*See* First Fink Decl., Ex. D; Second Brownell Decl., Ex. 2, at 10-11, Ex. 4.)  It is premature to determine the extent of Donaldson's knowledge at this early date.

[3] National Union issued CGL Policy No. 143-77-30 to Donaldson, effective July 31, 1996 to July 31, 1997.  (Compl., Ex. A, Dec. 21, 2010, Docket No. 1.)  National Union issued CGL Policy No. RMGL 143-84-85, effective July 31, 1997 to July 31, 1998.  (Compl., Ex. B.)  National Union issued CGL Policy No. RMGL 612-20-98, effective July 31, 1998 to July 31,

(Footnote continued on next page.)

Home issued two, consecutive CGL policies to Donaldson for annual periods between July 31, 2000 and July 31, 2002.[4]  Each policy contained a $1 million per-occurrence limit and a $500,000 per-occurrence deductible for bodily injury or property damage.

A key question in this matter is how Plaintiffs' policies were triggered by the damage allegedly caused by the air-intake ducts.  The policies state the following about property damage:

**1.     Insuring Agreement**

     **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies . . . .

     **b.**     This insurance applies to . . . "property damage" only if:

          **(1)**     The . . . "property damage" is caused by an "occurrence" . . .; and

          **(2)**     The "bodily injury" or "property damage" occurs during the policy period.

(Compl., Ex. A at 7, Ex. B at 5, Ex. C at 8, Ex. D at 8, Ex. E at 6; First Brownell Decl., Ex. 1 at 6.)  Property damage is thus covered if caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the

_____

(Footnote continued.)

1999.  (Compl., Ex. C.)  National Union issued CGL Policy No. GL 612-30-28, effective July 31, 1999 to July 31, 2000.  (Compl., Ex. D.)

   [4] American Home issued CGL Policy No. 457-12-34 to Donaldson, effective July 31, 2000 to July 31, 2001.  (Compl., Ex. E.)  American Home issued Policy No. 457-12-34 for the period July 31, 2001 to July 31, 2002.  (First Brownell Decl., Ex. 1.)

same general harmful conditions." (Compl., Ex. A at 17.)[5] The policies further state that property damage means:

> a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.* at 18.)

Plaintiffs' policies also contain a Batch Clause Endorsement, which combines certain property damage that might otherwise be subject to separate deductibles into one "occurrence." The Clause states:

> **Section V – Definitions [12/13] – Occurrence,** is amended to add new paragraph:
>
> As respects 'Products Completed Operations Hazard'[6] all . . . "property damage" arising out of and attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting one lot of goods or products manufactured, sold, handled or distributed by you or others trading under your name, shall be deemed to result from a single "occurrence." Such "occurrence" will be deemed to occur with the first injury notified to you during the policy period.

---

[5] Throughout this Order, the Court will cite to individual insurance policies that Plaintiffs issued to Donaldson. The language in the other insurance policies that Plaintiffs issued to Donaldson is the same, unless noted by the Court.

[6] "Products-completed operation hazards" is defined as "'property damage' occurring away from premises you own or rent arising out of 'your product' . . . ." (Compl., Ex. A at 17.) It is notable that the Batch Clause Endorsement applies to this general category of property damage. (*Cf. id.* at 18 (setting out distinctions between property that is physically injured and property that is not physically injured).)

(Compl., Ex. A, Endorsement 20 Revised, at 57.)[7]   Under this Endorsement, then, "occurrences" are deemed to occur with the first injury notified to "you" during the policy period.   The policies define "you" as "the Named Insured shown in the Declarations . . . ."  (Compl., Ex. A at 7.)[8]

### 2.   Federal and National Union's Umbrella Policies

Federal issued five, consecutive umbrella insurance liability policies to Donaldson effective for annual periods from July 31, 1996 to July 31, 2001.   (Am. Compl. ¶ 18, Docket No. 45; *e.g.*, Am. Compl., Ex. G.)   It also issued a second-layer-excess liability policy effective July 31, 2001 to July 31, 2002.   In addition, National Union issued two commercial umbrella liability policies to Donaldson, including a policy from July 31, 2001 to July 31, 2002.   (*See* Second Decl. of Matthew J. Fink, Ex. E, July 20, 2011, Docket No. 53.)

### D.   Plaintiffs' Coverage Position Prior to 2009

Donaldson notified Plaintiffs – or at least American Home – of the complaints filed against it regarding the air-intake ducts shortly after they were filed.   In response, on

---

[7] It appears but is not entirely clear that the Batch Clause Endorsement was included in the American Home July 31, 2001 to July 31, 2002 policy.  (*See* First Brownell Decl., Ex. 1, at 5.)

[8] Donaldson argues, however, that "you" should be defined by another endorsement in the policy.  (*See* Compl., Ex. A, Endorsement 5.)  This endorsement states that Donaldson must notify Plaintiffs of an "occurrence" when Donaldson's Director of Risk Management or his/her designee receives notice of that occurrence.  (*See id.*)

March 11, 2002, American Home's claims administrator sent a letter to Donaldson's third-party claims administrator, stating,

> [Due to the] Batch Clause Endorsement . . . all claims related to alleged faulty air intake systems on Western Star trucks would fall under one occurrence.  All the claims are subject to one deductible, and the limits of insurance for this occurrence are $1,000,000 . . . .  Per the Batch Clause Endorsement, we have created a date of loss of November 14, 2001, the date on the first summons received by the insured.  We have also combined the Arender and Bonner lawsuits under one claim number, [011811-003280-PB].  We suggest that you take similar steps regarding the date of loss and combination of all claims into one . . . .  This matter has the potential to exceed the policy limit of $1,000,000, therefore, the umbrella and excess carriers have been placed on notice.

(First Brownell Decl., Ex. 5.)  The letter carbon copied Donaldson.  (*Id.*)  At the time of this letter, the Burroughs cross-claim was pending.  American Home also sought information from Donaldson's third-party claims administrator relating to Donaldson's claim.  (Second Fink Decl., Ex. C.)

On May 28, 2002, American Home's claims administrator sent Donaldson a letter stating that it would "defend Donaldson subject to a full reservation of all of its rights" and that providing the defense "shall not act as an estoppel or waiver of any of the rights arising out of the policy or law."  (First Fink Decl., Ex. O (Corrected), Docket No. 35.) The letter further stated that it only addressed coverage under the American Home 2001-2002 Primary Policy, and that Donaldson should submit claims for coverage under different policies separately.   (*Id.*)  Then on June 9, 2003, National Union's claims

administrator also sent a letter to Donaldson purporting to reserve its rights.  (Second Fink Decl., Ex. E.)[9]

Donaldson selected the Mississippi firm of Butler Snow from a list of approved panel counsel to defend it in various lawsuits.  (Kohne Decl. ¶ 10.)  Donaldson asserts that, starting in 2002 and through the Burroughs settlement, a third-party claims administrator advanced payments to Donaldson for defense costs and settlements under the claim number 011811-003280-PB, all of which Plaintiffs approved.  *(Id. ¶ 13.)*

### E.    Plaintiffs' Handling of the Burroughs Cross-Claim

In early 2009, the state court scheduled a mediation regarding the Burroughs cross-claim for October 15, 2009.  *(Id. ¶¶ 14-15.)*  On July 22, 2009, Donaldson advised Plaintiffs' attorney of the mediation.  (First Fink Decl., Ex. P.)  From July to September 2009, at the request of Plaintiffs, Donaldson apparently provided copies of depositions, discovery, and pleadings related to the cross-claim.  Plaintiffs argue that, during this time, they first learned of certain issues relevant to Donaldson's claim, such as when Donaldson first received notice of the property damage.[10]

---

[9] The letter declared, among other reservations, "National Union's determination as to coverage as available to your company under the commercial umbrella policy is based upon the facts as presently known to us.  As a result, we reserve our right to modify our coverage position upon receipt of additional information.  All legal and policy defenses that National Union may have in connection with this matter, whether stated or not in this correspondence, are hereby reserved."  (Second Fink Decl., Ex. E.)

[10] As explained below, the date that Donaldson first received notice of the property damage is relevant to coverage under Plaintiffs' policies.

On September 2, 2009, Plaintiffs' authorized representative sent Donaldson a reservation of rights letter.  (First Fink Decl., Ex. Q; Donaldson Countercl. ¶ 112.)  The letter stated that Plaintiffs would defend Donaldson subject to a reservation of rights, including the right to seek the reimbursement of all deductibles.  (First Fink Decl., Ex. Q.)  It further requested specific information regarding the Burroughs cross-claim and the air-intake ducts.  (*Id.*)

According to Donaldson, "The October 15th mediation failed, in large part due to [Plaintiffs'] refusal to offer realistic sums to the *Burroughs* plaintiff to settle the case." (Kohne Decl. ¶ 16.)  According to Donaldson, Plaintiffs offered paltry sums at the settlement conference and put their own interests ahead of Donaldson.  (Countercl. ¶ 116.)

On December 28, 2009 and January 21, 2010, Plaintiffs' authorized representative again sent reservation of rights letters to Donaldson regarding their primary and umbrella policies.  (First Fink Decl., Exs. R and S.)  Plaintiffs stated for the first time that they sought a contribution of $2.5 million from Donaldson to satisfy deductibles for the Burroughs cross-claim.  (First Fink Decl., Ex. S.)  On January 27, Plaintiffs' authorized representative sent an e-mail to Donaldson's in-house counsel, stating that "[t]he coverage [dispute] will be addressed, if not before the mediation, then sometime thereafter." (Moon Decl., Ex. D, Oct. 24, 2001, Docket No. 110.)  Donaldson's counsel responded that Plaintiffs "must attempt to resolve the Burroughs claim at the mediation. If [Plaintiffs] believe[] there are litigation coverage issues, [Plaintiffs] should reserve [their] rights with respect to the settlement." (*Id.*)

On February 22, 2010, the Burroughs cross-claim settled.  Plaintiffs contributed a total of $3,548,387.10 and Federal contributed $2,451,612.90.  (Lindsay G. Arthur Aff., Ex. 1, at 1-8, Sept. 26, 2011, Docket No. 100.)   The settlement agreement signed by Donaldson and Burroughs stated, "Donaldson and its insurers shall have no further obligation."  (*Id.* at 4.)  Although the insurance companies' payment obligations were outlined in the settlement, no insurance company was a signatory to the settlement and the settlement only stated that it "contain[ed] the entire agreement between Burroughs and Donaldson . . . ."  (*Id.* at 7-8.)   On June 30, 2010, Plaintiffs sent Donaldson an invoice seeking repayment from the settlement in the amount of almost $2.5 million. (Countercl. ¶ 121.)

### F.      Federal's Involvement with the Burroughs Cross-Claim

Prior to the Burroughs settlement, Federal and Plaintiffs disputed the amount they should each contribute.   On February 9, 2010, Matthew Fink, coverage counsel for Plaintiffs, sent an e-mail to Michael Simmons, coverage counsel for Federal, about the Burroughs cross-claim.  (Moon Decl., Ex. E.)  The e-mail stated that Plaintiffs were,

> willing to pay additional sums allocable to [Federal] to attempt to settle the case under a reservation of rights.  I requested [to your associate] that if [Federal has] an objection with the mediation continuing in this matter or an objection as to the reasonableness of the settlement offers that [Federal] make its objection known.  I was informed that [Federal has] no position as it was still evaluating coverage and the liability/damage exposure presented by the case.  Therefore, [your associate] expressed to me that [Federal] was neither agreeing to nor objecting to the reasonableness of the settlement or the manner in which the mediation was proceeding.

> [Federal] has been on notice of this claim in excess of six months. [Plaintiffs] believe[] that [Federal] has had a sufficient time to evaluate the

coverage issues and liability/damages exposure in the underlying case.
[Plaintiffs] will proceed to protect [their] insured's interests and reserve[]
the rights to recoup any settlement payment that is allocable to [Federal].

(*Id.*)

Simmons responded on February 9, 2010 stating, "Do not presume to tell me
[Federal] has had sufficient time to consider coverage issues" and "We will disclose our
coverage position when it has been finalized." (Moon Decl., Ex. F.) Simmons's e-mail
acknowledged that Plaintiffs "had changed its position three weeks before a mediation,
taking $25 million in primary coverage off the table and the position that it now has only
$3 million in primary coverage." (*Id.*) It further recognized that policy years prior to
2001-2002 were potentially implicated by Plaintiffs' position. (*Id.*)

On February 18, Simmons sent a letter to Fink and Donaldson's lawyer outlining
Federal's willingness to contribute to the settlement. (Moon Decl., Ex. 7.) It also stated,
"The foregoing offer to contribute to settlement is made . . . with a full reservation of all
rights against all parties, both under Federal's policies and applicable law." (*Id.*)
Plaintiffs allege that, on February 19, Plaintiffs and Federal had a telephone conversation
in which they again reserved all rights against each other to seek additional contribution.
(*See* Moon Decl., Ex. H.) Then, that same day, Plaintiffs' authorized representative sent
Federal's authorized representative an e-mail describing the exact dollar amounts
proposed for the settlement of the Burroughs counter-claim. (*Id.*) The e-mail stated,
"Please note that [Plaintiffs have] reserved all rights in this matter; and [we]
acknowledge[] that [Federal] has reserved all rights as well." (*Id.*) Federal's

- 13 -

representative responded by stating the amounts that Federal would pay for the settlement under particular policy numbers.  (*Id.*)

### G.      Status of Discovery

Only limited discovery has been completed in this case.  (*See* Order on Disc. Motions, Oct. 14, 2011, Docket No. 103.)  Matthew Fink, attorney for Plaintiffs, and Lindsay G. Arthur, attorney for Federal, both submitted Rule 56(d) affidavits arguing that discovery of additional facts is necessary before the Court rules on Donaldson's summary judgment motion.  (Rule 56(d) Aff. of Matthew J. Fink, June 1, 2011, Docket No. 33; Rule 56(d) Aff. of Lindsay G. Arthur, Sept. 26, 2011, Docket No. 95.)

## ANALYSIS

## I.      STANDARDS OF REVIEW

Federal brings a motion for judgment on the pleadings.  When considering a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the Court must "'accept as true all factual allegations set out in the complaint' and . . . 'construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [their] favor.'" *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).  A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6).  *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Federal, Donaldson, and Plaintiffs also bring summary judgment or partial summary judgment motions.  Summary judgment is appropriate where there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    FEDERAL'S MOTIONS

Plaintiffs included Federal in this action in case the Court determines that the Burroughs settlement falls in a policy year for which Federal possessed additional coverage responsibilities.[11]   (Am. Compl. ¶¶ 68-75.)  Federal responded by bringing a motion for judgment on the pleadings or, alternatively, summary judgment on the ground that Plaintiffs did not reserve their rights to reallocate the Burroughs settlement payments between Plaintiffs and Federal.  (Docket No. 97.)  Federal presents four arguments why Plaintiffs cannot seek reimbursement for its settlement payments: (1) waiver,

---

[11]  Specifically, Plaintiffs contend, "To the extent that the settlement is allocated to a single policy period, the settlement must be allocated to the 1999-2000 policy period [instead of the 2001-2002 policy period].  In that case, American Home and/or National Union paid amounts to settle the *Burroughs* cross-claim in excess of their applicable policy limits, which are within the coverage obligation of the Federal umbrella policies."  (Am. Compl. ¶ 70.)

(2) estoppel, (3) accord and satisfaction, and (4) judicial estoppel.  Because the pleadings and the evidence presented thus far have established none of Federal's theories, the Court will deny Federal's motions.

### A.      Waiver

Federal first argues that Plaintiffs' conduct waived their right to seek reimbursement from Federal for the Burroughs settlement.  Waiver is "an intentional relinquishment of a known right." *Stephenson v. Martin*, 259 N.W.2d 467, 470 (Minn. 1977).  Both knowledge and intention are essential elements of waiver. *Id.*  Knowledge may be actual or constructive, and intention can be inferred from conduct. *Id.*  Unlike estoppel, waiver does not require detrimental reliance. *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1056 (8th Cir. 2006).  Waiver is "ordinarily a question of fact for the jury" and is "rarely to be inferred as a matter of law." *Physical Distrib. Servs., Inc. v. R.R. Donnelley & Sons Co.*, 561 F.3d 792, 795 (8th Cir. 2009) (internal quotation marks omitted).

The settlement agreement entered into by Burroughs and Donaldson does not, by its plain terms, waive Plaintiffs' right to seek reimbursement from Federal.  Although the settlement states that "Donaldson and its insurers shall have no further obligation," this statement is a release of Donaldson, Federal, and Plaintiffs **by Burroughs**.  It does not release Federal from claims by Plaintiffs because this statement was included in a clause discussing payment obligations to Burroughs and because neither Plaintiffs nor Federal were signatories to the agreement.  (*See* Arthur Aff., Ex. 1, at 4); *cf. Stephenson*, 259

N.W.2d at 470-71 (holding that an insurance company waived its right of subrogation by executing an "unambiguous" stipulation of "full, final and complete settlement" with an opposing party, despite a reservation of rights letter).  At this stage, Federal has pointed to no documents executed by Plaintiffs or Donaldson[12] that release Federal from further liability.

The question remains, however, whether Plaintiffs' conduct around the time of the Burroughs settlement, including their contribution to the settlement, constituted an intentional relinquishment of a known right.  To make this determination, the Court must analyze whether Plaintiffs' actions demonstrate an intention to release Federal from further liability.

The Court finds that, based on the evidence currently before it, Plaintiffs did not waive any right to reimbursement.  *See Bogenholm by Bogenholm v. House*, 388 N.W.2d 402, 405 (Minn. Ct. App. 1986) (declining to bind party to results of previous adjudication without evidence that the party agreed to be bound by that result).  Plaintiffs and Federal both made reservations of rights to one another around the time of settlement.  (*See* Moon Decl., Exs. E, F, G, H.)  Specifically, Plaintiffs stated that they

---

[12] The Court notes that, to the extent that Plaintiffs' claims against Federal rely on a theory of subrogation, any release of Federal from further liability executed by Donaldson might preclude Plaintiffs from pursuing this action against Federal.  *See West American Ins. Co. v. Ford Motor Co.*, 759 F. Supp. 547, 550-52 (D. Minn. 1991) (holding that an insurance company could not seek subrogation against third party when the insured had released the third party from liability); *but see Travelers Indem. Co. v. Vaccari*, 245 N.W.2d 844, 847 (Minn. 1976) ("[W]hen a [party and a party's insurer], with notice of an insurer's subrogation claim, procures a general release by making a settlement with the insured, the release will not affect the insurer's right of subrogation.").

"reserved[d] the rights to recoup any settlement payment that is allocable to [Federal]" and again reserved their rights when they proposed specific contributions to the settlement. (Moon Decl., Exs. E, H.)[13]   In other words, it appears that both Plaintiffs and Federal left the question of ultimate responsibility for the settlement unresolved.   In addition, Federal appears to have known the nature of the coverage dispute and the potential implications of Plaintiffs' reservation of rights.  (*See* Moon Decl., Ex. F.); *see Jacobs v. Cable Constructors, Inc.*, 704 N.W.2d 205, 209-10 (Minn. Ct. App. 2005) (holding that excess insurer could recoup a contribution to a Minnesota Rule of Civil Procedure 68 settlement, if the primary insurer had notice of the excess insurer's intent to recoup).  As the record stands now, Federal has not established waiver.

## C.    Estoppel

"A party seeking to invoke the doctrine of equitable estoppel has the burden of proving three elements: (1) that promises or inducements were made; (2) that it reasonably relied upon the promises; and (3) that it will be harmed if estoppel is not

---

[13] Federal has cited cases from other jurisdictions that demand specific and timely reservations of rights.  Federal has cited to no Minnesota case that demands a specific reservation of rights or requires that the reservation occur at the time of settlement.  But even assuming that Minnesota courts adopt these positions, Federal has not proven that Plaintiffs failed to effectively reserve their rights or that Federal did not know that Plaintiffs might seek reimbursement.  *See Nobel Ins. Co. v. Austin Powder Co.*, 256 F. Supp. 2d 937, 940 (W.D. Ark. 2003) (holding that an insurer must "1) timely and explicitly reserve[] its right to recoup the costs; and 2) provide[] specific and adequate notice of the possibility of reimbursement"); *Am. Nat'l Fire Ins. Co. v. York Cnty.*, 582 F. Supp. 2d 69, 80-81 (D. Maine 2008) (holding that insurer was estopped from seeking reimbursement because, considering the overall settlement negotiations, it was unreasonable for insurer not to explicitly reserve its rights when it offered its contribution); *Mut. of Enumclaw Ins. Co. v. State Farm*, 682 P.2d 317, 319 (Wash. Ct. App. 1984) (mandating that reservations of rights expressly reserve a claim).

applied." *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn. 1990). At this stage, Federal has not shown that Plaintiffs made a promise or inducement. Instead, as discussed above, Plaintiffs appear to have reserved their rights and Federal to have been on notice of the ongoing coverage dispute. As with waiver, the Court finds that Federal has not established estoppel.[14]

### D.    Accord and Satisfaction

An accord and satisfaction exists if (1) the party, in good faith, tenders an instrument to a claimant as full satisfaction of the claim; (2) the instrument or an accompanying written communication contains a conspicuous statement to the effect that the instrument is tendered as full satisfaction of the claim; (3) the amount of the claim is unliquidated or subject to a bona fide dispute; and (4) the claimant obtained payment of the instrument. *Webb Bus. Promotions, Inc. v. Am. Elecs. & Entm't Corp.*, 617 N.W.2d 67, 73 (Minn. 2000). "The purpose of accord and satisfaction is to allow parties to resolve disputes without judicial intervention by discharging all rights and duties under a contract in exchange for a stated performance, usually a payment of a sum of money." *Id.* Accord and satisfaction can apply to insurance agreements. *See Addison Miller, Inc.*

---

[14] There may be additional barriers if Federal attempts to require Plaintiffs to contribute more to the settlement than was warranted under the terms of Plaintiffs' insurance policies. *See infra* Part III(B); *Minn. Commercial Ry. Co. v. Gen. Star Indem. Co.*, 408 F.3d 1061, 1064 (8th Cir. 2005) ("[T]he insured must demonstrate prejudice and an assumption of defense to expand the scope of coverage.").

*v. Am. Cent. Ins. Co.*, 249 N.W. 795, 797-99 (Minn. 1933); Couch on Insurance § 215:9 (3d ed. 2011).

Federal and Plaintiffs did not enter into an accord and satisfaction because they did not owe debts directly to one another, nor did they tender payments to one another.[15] Federal has pointed to no case in Minnesota or elsewhere where an insurer's payment of an insured's claim has constituted an accord and satisfaction between insurers. Also, it appears that Plaintiffs did not accept or tender any payments in full satisfaction of their coverage dispute with Federal, but rather expressly reserved their rights against Federal. *See Am. Nat'l Fire Ins. Co. v. York Cnty.*, 582 F. Supp. 2d at 79 ("An accord and satisfaction would not be found if [the insurer] had explicitly reserved its rights . . . ."). Thus, accord and satisfaction does not preclude Plaintiffs from seeking payments from Federal.[16]

_____

[15] Any agreement between Federal and Plaintiffs would more properly be described as a contract. At this stage, Federal has not established that Plaintiffs entered into a contract with Federal to resolve their coverage dispute.

[16] Plaintiffs appear to be seeking reimbursement on their own behalf under a theory of indemnification. "Indemnification differs from subrogation in that the entity seeking indemnification does so in its own right, while in the latter the subrogee succeeds to another's right to payment." *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 276 (Ill. 2004). To the extent that Plaintiffs' claims rest on subrogation, however, Plaintiffs stand in the shoes of Donaldson. *See Medica, Inc. v. Atlantic Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997). Federal has not established that it had a valid accord and satisfaction with Donaldson, either, because it has pointed to no conspicuous statement that its insurance payment was tendered as full satisfaction of its insurance obligations to Donaldson.

### E.      Judicial Estoppel

"Judicial estoppel is an equitable doctrine that prevents a party from assuming inconsistent positions in the course of litigation." *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 800 (Minn. 2004).   The doctrine of judicial estoppel has three elements: (1) "the party presenting the allegedly inconsistent theories must have prevailed in its original position[,]" (2) "there must be a clear inconsistency between the original and subsequent position of the party[,]" and (3) "there must not be any distinct or different issues of fact in the proceedings."   *State v. Pendleton*, 706 N.W.2d 500, 507 (Minn. 2005).   The purpose of judicial estoppel is "to protect the integrity of the judicial process."   *N.H. v. Me.*, 532 U.S. 742, 743 (2001).   The Minnesota Supreme Court has not decided if judicial estoppel exists in Minnesota.   *See Pendleton*, 706 N.W.2d at 507.

To establish judicial estoppel, the facts must demonstrate that Plaintiffs promoted a successful position that they have now disavowed.   *See id.*; *Kale v. Obuchowski*, 985 F.2d 360, 361-62 (7th Cir. 1993) ("Persons who triumph by inducing their opponents to surrender have 'prevailed' as surely as persons who induce the judge to grant summary judgment.").   It appears, however, that Plaintiffs have not contradicted an earlier position. Rather, it seems that Plaintiffs contributed to the Burroughs settlement after objecting to their obligation to pay, reserving their rights, and giving notice that they might pursue additional contributions from Federal.   *See Faber v. Roelofs*, 250 N.W.2d 817, 820 (Minn. 1977) (stating that an insurer may deny liability under an insurance policy when that insurer goes through the "simple procedure of giving a notice of reservation of rights").   Accordingly, Plaintiffs have not degraded the integrity of the judicial process or

abandoned a position that prevailed in a previous proceeding.  *See Me.*, 532 U.S. at 750; *Pendleton*, 706 N.W.2d at 507.

Because Federal has not established waiver, estoppel, accord and satisfaction, or judicial estoppel, the Court will deny Federal's motions.  The Court will deny Federal's motion for judgment on the pleadings with prejudice.  Because of the early stage of the litigation, however, the Court will deny Federal's summary judgment motion without prejudice to allow for further development of the record.

## III.    PLAINTIFFS' AND DONALDSON'S MOTIONS

Plaintiffs seek partial summary judgment on their complaint and, specifically, a declaration that the Burroughs settlement triggers multiple insurance policy periods and that the settlement must be allocated across those periods.  (Docket No. 29.)  If Plaintiffs succeed in this motion, Donaldson would be responsible for additional $500,000 deductibles.

Donaldson seeks summary judgment on Plaintiffs' declaratory judgment claims and partial summary judgment on its declaratory judgment counterclaim.  (Docket No. 14.)  Specifically, Donaldson seeks a declaration that the Burroughs settlement is covered as a single occurrence under the American Home 2001-2002 Policy, and accordingly, that the additional policies under which the Plaintiffs seek reimbursement from Donaldson do not apply.  (*See id.*)  Under this analysis, Donaldson would be responsible for only one $500,000 deductible under the 2001-2002 policy.  The Court will deny both motions because Plaintiffs are not estopped by their prior conduct and because the Court

possesses insufficient information to determine the coverage obligations implicated by the Burroughs settlement.

## A.      Estoppel

Donaldson first claims that Plaintiffs are estopped from denying that the Burroughs settlement constitutes one "occurrence" under the 2001-2002 policy and must provide coverage accordingly, as a result of American Home's March 11, 2002 letter and subsequent conduct.  To estop an insurer from denying coverage that may not fall under its insurance policy, an insured must demonstrate that (1) the insurer controlled litigation for the insured when it contributed to a settlement or other award, and (2) the insured will experience prejudice if the insurer is allowed to claim that it should not have contributed that amount due to the terms of its insurance policy.  *Minn. Commercial Ry. Co. v. Gen. Star Indem. Co.*, 408 F.3d 1061, 1064 (8th Cir. 2005).  Estoppel does not apply where the insurer gives adequate notice of a reservation of rights or does not possess knowledge of critical facts when contributing to a settlement.  *Id.*  Estoppel must be "established by a preponderance of the evidence, and the facts used to prove [it] must be clear, positive, and unequivocal in their implications."  *Id.* at 1063 (internal quotation marks omitted).

Donaldson has not demonstrated the necessary elements of estoppel.  As a preliminary matter, the primary basis for Donaldson's estoppel claim is a letter from American Home, and Donaldson has not established that American Home's letter estops National Union.  Furthermore, the current record indicates that Plaintiffs reserved their rights in 2002, 2003, and again in 2009 and 2010.  (*See* First Fink Decl., Ex. O

(Corrected); Second Fink Decl., Ex. E; First Fink Decl., Exs. Q, R and S.)[17] Finally, Donaldson has failed to demonstrate prejudice from Plaintiffs' actions. Donaldson has alleged, for example, that it missed settlement opportunities as a result of Plaintiffs' conduct, but has not provided the details or evidence necessary to support these allegations. Accordingly, at this stage, Donaldson has not established estoppel.

### B. Insurance Policies and the Burroughs Settlement

Because Plaintiffs are not estopped from denying coverage, the Court must determine how Plaintiffs' policies apply to the Burroughs settlement. As an overarching matter, the Court finds that Plaintiffs' and Donaldson's summary judgment motions are premature and that it cannot determine the policy periods or number of "occurrences" implicated by the Burroughs settlement. The Court cannot determine at this stage, among other matters, the relevant characteristics of the air-intake ducts, the cause of the alleged damage to the ducts and engines, or when Donaldson's employees were first notified of that damage. Federal Rule of Civil Procedure 56(d), 56(e)(1), and 56(e)(4) permit a court to deny a motion for summary judgment if a party has not yet had the opportunity to present facts essential to justify its opposition. The parties have completed very little discovery, and there are factual disputes on critical issues. The Court will thus deny

---

[17] *See also St. Paul Sch. Dist. No. 625 v. Columbia Transit Corp.*, 321 N.W.2d 41, 46-47 (Minn. 1982) (holding that an insurance company was not estopped from denying coverage, despite a late reservation of rights), *abrogated on other grounds by Cargill, Inc. v. Ace Am. Ins. Co.*, 784 N.W.2d 341 (Minn. 2010); *Secura Ins. v. Horizon Plumbing, Inc.*, Civil No. 11-2427, 2012 WL 686209, at *5 (8th Cir. Mar. 5, 2012) (declining to find waiver under Missouri law where an insurance company tendered a defense subject to an express reservation of rights).

Plaintiffs' and Donaldson's motions, without prejudice, as premature.[18]   *See Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999).   To aid the parties and limit the scope of this matter, however, the Court will analyze key provisions of Plaintiffs' insurance policies and how they may apply to this case.

### 1.   Insurance Policy Interpretation

Established principles must guide the Court's interpretation of an insurance policy. If a policy is unambiguous, the Court must give the language its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life. Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986).   If the policy language is ambiguous, the ambiguity must be resolved in favor of the insured. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 36 (Minn. 1979).   Policy language is ambiguous if it is subject to two or more reasonable interpretations. *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997).   Policy words of inclusion are broadly construed, and words of exclusion are narrowly considered. *Gen Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009).

The insured – here, Donaldson – bears the burden of demonstrating coverage under an insurance policy. *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006).   Exclusions are construed narrowly and strictly against the insurer. *Id*.   Coverage under the policy is construed in accordance with the

---

[18] Plaintiffs seek a judicial determination that more than one policy period is triggered, but the Court cannot make even this general determination without more information, as explained further below.

expectations of the insured. *Id.* The Court must construe the insurance contract as a whole, rather than mechanistically parse individual provisions. *See Horizon III Real Estate v. Hartford Fire Ins. Co.*, 186 F. Supp. 2d 1000, 1004-05 (D. Minn. 2001).

For insurance contract-related issues, Minnesota courts consider many factors, including policy language, parties' intent or reasonable expectations, canons of construction, and public policy. *N. States Power Co. v. Fidelity and Cas. Co. of N.Y.*, 523 N.W.2d 657, 661 (Minn. 1994). Under Minnesota law, however, courts may consider issues outside the contract's plain language, such as parol evidence, "only if the contract is ambiguous on its face." *See Thomsen v. Famous Dave's of Am., Inc.*, 606 F.3d 905, 908 (8th Cir. 2010) (quoting *Hous. and Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005)). Using these principles of interpretation, the Court will analyze provisions of Plaintiffs' policies that are important to the parties' dispute.

### 2.    Notification Requirement

The parties argue that different events trigger coverage for property damage under Plaintiffs' insurance policies. The events that trigger coverage are critical to the parties' dispute because it defines which policies cover the Burroughs cross-claim and how many deductibles are triggered under each policy.

To determine which events trigger coverage for the Burroughs cross-claim, the Court must interpret the policies' Batch Clause Endorsement. *See Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 733 (Minn. 1997) ("CGL policies come in many forms and it is a mistake to read our case law as if the scope of coverage has been

resolved for all such policies, no matter what their language."). The Batch Clause Endorsement states that certain property damage[19] "shall be deemed to result from a single 'occurrence'" and that this single occurrence "will be **deemed to occur with the first injury notified to you** during the policy period." (Compl., Ex. A, Endorsement 20 Revised, at 57 (emphasis added).) The Court finds that this language unambiguously combines property damage, including damage that may take place across multiple policy periods, into one "occurrence" that takes place when Donaldson is notified of that damage.[20]

Plaintiffs assert that the Batch Clause Endorsement only combines injuries that take place during an individual policy year into one "occurrence" and cannot combine injuries that extend across policy years. As support, they point out that the Batch Clause Endorsement combines claims into one "occurrence" based on the "first injury notified to you **during the policy period**." (*See* Compl., Ex. A, Endorsement 20 Revised, at 57 (emphasis added).) This provision does not indicate, however, that the Batch Clause

---

[19] The Court will only discuss how coverage is triggered for the type of property damage that falls under the Batch Clause Endorsement, because this appears to be the property damage at issue. The Batch Clause Endorsement applies to property damage "arising out of and attributable directly or indirectly to the continuous, repeated, or related exposure to substantially the same general conditions affecting one lot of goods . . . ." (Compl., Ex. A, Endorsement 20 Revised, at 57.) It appears, at this stage, that the property damage at issue stemmed from continuous, repeated, or related exposure to substantially the same general conditions that affected one or more lots of goods.

[20] Of course, an "occurrence" that **causes** an injury cannot, in reality, "occur" after the injury **already exists** and is known to Donaldson. The Batch Clause Endorsement thus artificially bundles property damage into one "occurrence" that "occurs," for the purposes of coverage, at the time when Donaldson is notified of an injury to property.

Endorsement can only combine claims that actually took place during that policy period. Instead, it is **notice** during the policy period that is required for coverage to exist under that policy year.  In other words, the Batch Clause Endorsement does not state that each **injury itself** must occur during a policy period to be covered under that policy. Accordingly, the Court finds that the Batch Clause Endorsement can combine injuries across policy years into one "occurrence," and, accordingly, that it is possible only one policy year is implicated by the Burroughs cross-claim.[21]

The remainder of Plaintiffs' policies is also consistent with this reading of the Batch Clause Endorsement.  *See Bobich v. Oja*, 104 N.W.2d 19, 24 (Minn. 1960) ("A policy and endorsements should be construed, if possible, so as to give effect to all provisions . . . .").  Specifically, the policies' statement that property damage must "occur[] during the policy period" is consistent with the Batch Clause Endorsement: property damage "occurs," pursuant to the Endorsement, when Donaldson is notified of that damage, and coverage kicks in when Donaldson receives such notification.  (Compl., Ex. A, at 7.)[22]  In addition, even if the body of the policy were inconsistent with the Batch

---

[21] The number of policy years and deductibles implicated by the Burroughs cross-claim will likely depend on how many "lots" of product are involved, which is discussed further below.

[22] Federal argues that, because Plaintiffs' policies state that "loss of use" stemming from property damage "shall be deemed to occur at the time of the [physical injury] that caused it," Plaintiffs' policies only cover physical injuries to the Burroughs trucks in the policy years that those injuries actually took place. (*See* Compl., Ex. A, at 18.)  The Court finds, however, that the "loss of use" clause simply combines all loss of use with the physical injury that caused it, which is not inconsistent with the Batch Clause Endorsement.  Pursuant to the Batch Clause Endorsement, the timing of physical injury to property, for the purposes of coverage, is when Donaldson is notified of that injury.  Thus, reading the "loss of use" and Batch Clause

(Footnote continued on next page.)

Clause Endorsement, the Endorsement would govern. *See Bobich*, 104 N.W.2d at 24 ("[W]here provisions in the body of the policy conflict with an endorsement or rider, the provision of the endorsement governs.").

Although not necessary to the Court's determination, the Court also notes that this interpretation of Plaintiffs' policies is consistent with the apparent intent of the parties. The result of Plaintiffs' contrary reading, which would likely deem property damage to "occur" in policy periods where Donaldson received no notification of such damage, might be to leave Donaldson with no coverage for such damage. Gaps in coverage "are fundamentally inconsistent with a 'comprehensive' (or 'ultra comprehensive') liability policy . . . ." *London Mkt. Insurers v. Superior Court*, 53 Cal. Rptr. 3d 154, 166 (Cal. Ct. App. 2007). Furthermore, the Court should not adopt an interpretation that defeats the apparent purpose of the Batch Clause Endorsement, which is to combine claims into fewer "occurrences" and deductibles and not to preclude coverage altogether. *See Am. Ins. Co. v. St. Jude Med., Inc.*, Civil No. 08-13, 2010 WL 3733009, at *5 (D. Minn. 2010) (declining to render a batch clause endorsement "meaningless by placing a claim in one policy period while assigning the bodily injury to another.").

Accordingly, the Court finds that the Batch Clause Endorsement triggers coverage for pertinent property damage when the insured is notified of that damage, even if the damage actually took place across multiple policy periods. The Court cannot determine

_____

(Footnote continued.)

Endorsement together, both loss of use and property damage are deemed to occur at the same time, which is when Donaldson is notified of the property damage.

how the Batch Clause Endorsement specifically applies to this case, however, for the reasons outlined below.

### 3. Sufficiency of Notification

The parties also dispute who at Donaldson must be notified to trigger policy coverage under the Batch Clause Endorsement. The Batch Clause Endorsement deems "occurrences" to take place, and thus property damage to be covered, when the first injury is notified to "you" during the policy period. The policies define "you" to include "Donaldson," including Donaldson's "executive officers and directors, stockholders, and employees within the scope of their employment and while performing duties related to the conduct of their business." (Compl., Ex. A at 1, 12.) The Court finds that this definition of "you" is unambiguous and applies to the Batch Clause Endorsement.

The Court acknowledges that a separate endorsement in the policies states that Donaldson is deemed to have notice of an occurrence only when Donaldson's Director of Risk Management and/or his designee receives notice. (*See* Compl., Ex. A, Endorsement 5, at 36.) This endorsement, however, specifically deals with when Donaldson is deemed to have notice of an occurrence sufficient to require that it notify Plaintiffs of that occurrence, in order to request coverage. (*See id.*) Because this endorsement has a different purpose and does not modify the definition of "you" applicable to the rest of the policy, the Court finds that it has no effect on the Batch Clause Endorsement. Because the Court cannot determine on this record when Donaldson's employees first received

notice of the property damage at issue, the Court will not grant summary judgment regarding which policy years are triggered by the Burroughs cross-claim at this stage.[23]

### 4.   Definition of "Lot"

The parties also dispute the meaning of the term "lot" within the Batch Clause Endorsement.  As stated above, the Batch Clause Endorsement defines one occurrence as applying to all

> 'property damage' arising out of and attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting **one lot** of goods or products manufactured, sold, handled or distributed by you or others trading under your name . . . .

(Compl., Ex. A, Endorsement 20 Revised, at 57.)

Webster's Dictionary defines "lot" as "all the members of a present group, kind, or quantity; . . . kind, sort." *Merriam-Webster's Collegiate Dictionary* 736 (11th Ed. 2007); *see also Webster's Ninth New Collegiate Dictionary* 708 (1984).  Because Donaldson apparently makes unique products tailored to individual companies like Western Star, the Court finds that "lot" likely applies to each type of unique product as a distinct group, kind, or sort.  *See Conagra Foods, Inc. v. Lexington Ins. Co.*, 2009 WL 3688014, at *4 (Del. Super. Ct. 2009) (suggesting that all bodily injury claims arising collectively out of salmonella-tainted peanut butter made in one plant could constitute one "lot"), *overruled*

---

[23] The record has some information regarding when Donaldson received notice of property damage related to the Burroughs cross-claim, but it does not conclusively demonstrate when Donaldson **first** received notice of the damage.  Discovery must be completed before the Court can decide this issue.

*on other grounds by ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 72 (Del. Super. Ct. 2011).

The Court further finds that the plain meaning of the term "lot" does not contain an arbitrary temporal limitation. *See Miller v. Mut. Life Ins. Co. of N.Y.*, 289 N.W. 399, 400 (Minn. 1939) ("We do not see any reason for reading into [insurance] policies . . . a condition . . . when the insurer who drafted the contracts did not care to or at least did not incorporate such a provision."). Identifying an artificial temporal limitation in the term "lot" appears particularly inappropriate in this case because Plaintiffs deleted from their policy a definition that limited a "lot" to one day's worth of product. (*See* Compl., Ex. A, Original Endorsement #20.)

It is premature, however, for the Court to define how the term "lot" applies to Donaldson's products without more information. The air-intake ducts at issue may have included products with different specifications, product numbers, and base materials. While the term "lot" potentially applies to each type of unique product designed and manufactured by Donaldson, the term would not apply to products with distinctive qualities that cannot reasonably constitute a group, kind, or sort. *See Merriam-Webster's Collegiate Dictionary* 736. Because little discovery has been completed at this stage regarding the qualities of Plaintiffs' air-intake ducts, the Court declines to further define "lot" or to determine how the term applies to Plaintiffs' products. The Court will deny Plaintiffs' and Donaldson's motions for summary judgment without prejudice to allow for further development of the record.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant Donaldson's Motion for Summary Judgment and Partial Summary Judgment [Docket No. 14] is **DENIED without prejudice**;

2.     Plaintiffs American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, PA's Motion for Partial Summary Judgment [Docket No. 29] is **DENIED without prejudice**;

3.     Defendant Federal's Motion for Judgment on the Pleadings [Docket No. 97] is **DENIED with prejudice;**

4.     Defendant Federal's Motion for Summary Judgment [Docket No. 97] is **DENIED without prejudice**.

DATED:  March 30, 2012            _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                           United States District Judge