# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and AMERICAN HOME ASSURANCE COMPANY, | Civil No. 10-4948 (JRT/TNL) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| DONALDSON COMPANY, INC. and FEDERAL INSURANCE COMPANY, | |
| Defendants. | |

Cody S. Moon, **NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP**, 71 South Wacker Drive, Suite 4400, Chicago, IL 60606; and Nicholas H. Jakobe and Patrick D. Reilly, **ERSTAD & RIEMER, P.A.**, 8009 34th Avenue South, Suite 200, Minneapolis, MN 55425, for plaintiffs.

Matthew B. Kilby and Rikke A. Dierssen-Morice, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; and Margaret S. Brownell, **MASLON LLP**, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402, for defendant Donaldson Company, Inc.

Beth A. Jenson Prouty and Lindsay G. Arthur, Jr., **ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, PA**, 81 South Ninth Street, Suite 500, Minneapolis, MN 55402, for defendant Federal Insurance Company.

Plaintiffs National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and American Home Assurance Company ("American Home") bring this action against their insured, Defendant Donaldson Company, Inc. ("Donaldson"), and

Donaldson's excess insurer, Defendant Federal Insurance Company ("Federal"). National Union and American Home contributed to a settlement on behalf of Donaldson and are now seeking to recover those contributions. This matter is now before the Court on Plaintiffs' motion for judgment on the pleadings, summary judgment motions by all parties, and separate *Daubert* motions filed by Donaldson and Federal. Because the Court finds that Donaldson has adequately pled recoverable damages in its counterclaim, the Court will deny Plaintiffs' motion for judgment on the pleadings. The Court will grant in part Plaintiffs' and Donaldson's motions for summary judgment, and deny Federal's motion for summary judgment, because the Court finds that there were two "lots" in the *Burroughs* cross-claim litigation. Finally, the Court will grant Donaldson's and Federal's *Daubert* motions, because the Court finds that the experts' testimony is unnecessary at this stage in the litigation.

## BACKGROUND[1]

### A.    ENGINE DUSTING

During the 1990s, Donaldson designed and manufactured plastic air-intake ducts for the air-intake system on trucks manufactured by Western Star Trucks ("Western Star"). (Decl. of Margo S. Brownell ("First Brownell Decl."), Ex. 2 at Vol. II: 38-39, May 2, 2011, Docket No. 17; Donaldson's Ans. to Am. Compl. & Countercl. ("Donaldson Countercl.") ¶ 100, Aug. 30, 2011, Docket No. 84.)  The air-intake ducts

---

[1] A more complete recitation of the facts is available in this Court's Order on the parties' cross-motions for summary judgment and judgment on the pleadings. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.*, No. 10-4948, 2012 WL 1072329, at *1-*6 (D. Minn. Mar. 30, 2012).

delivered clean air into the internal part of diesel truck engines.  (First Brownell Decl., Ex. 2, at Vol. I: 131.)[2]

In 2001, purchasers of Western Star trucks began filing claims against Donaldson, alleging that the walls of the air-intake ducts were too thin, causing the ducts to soften and melt.  (First Brownell Decl., Ex. 3 (Dep. of Robert Burroughs) at 323; Donaldson Countercl. ¶ 102.)  The melting of the ducts allegedly caused the collapse of the air-intake duct walls and the failure of engines in some trucks.  (Donaldson Countercl. ¶ 102.)  On November 8, 2001, several purchasers of Western Star trucks filed *Otho Arender v. Burroughs Diesel, Inc.* in Mississippi state court against Burroughs Diesel, Inc. ("Burroughs"), Donaldson, and Western Star, alleging that they could no longer operate their Western Star trucks due to engine dusting.  (Decl. of Matthew J. Fink ("First Fink Decl."), Exs. J, K, June 1, 2011, Docket No. 32; Donaldson Countercl. ¶¶ 105-106.)  Burroughs, a commercial dealer of Western Star trucks, filed a cross-claim against Donaldson alleging that the defective ducts had led to premature failure of engines in several hundred trucks sold between 1989 and 1999 ("the *Burroughs* cross-claim").  (Donaldson Countercl. ¶¶ 101, 107; First Brownell Decl., Ex. 3 at 160; Second Decl. of Margo S. Brownell ("Second Brownell Decl."), Ex. 2 at 2.)

The parties agree that Donaldson first received notice of the Burroughs engine damage from product numbers 317 and 319 on January 5, 2000, when Western Star representative Dennis Trittin called Donaldson.  (*See* Decl. of Rikke Dierssen-Morice

---

[2] The ducts had different product numbers; the relevant numbers for the purposes of this litigation are product numbers 317 and 319.

("Eighth Dierssen-Morice Decl."), Ex. 4, July 1, 2014, Docket No. 282.) Trittin's Dealer Contact Report evinces that Trittin spoke with Arnie Carlson, manager of field technical support at Donaldson, about three trucks with dusted engines from Donaldson air-intake ducts. (*Id.* at 9.) At that time, Trittin informed Carlson of the problems the trucks were experiencing, which included engine dusting from both product numbers 317 and 319. (*See id.*)

## B.   INSURANCE POLICIES

### 1.   Commercial General Liability Policies

Plaintiffs insured Donaldson from 1996 to 2002, with largely identical insurance policies. National Union issued four commercial general liability ("CGL") policies to Donaldson, effective for consecutive annual periods from July 31, 1996 to July 31, 2000.[3] American Home issued two, consecutive CGL policies to Donaldson for annual periods between July 31, 2000 and July 31, 2002.[4] Each policy contained a $1 million per-occurrence limit and a $500,000 per-occurrence deductible for bodily injury or property damage. (*See, e.g.*, Compl., Ex. B (National Union CGL Policy No. RMGL 143-84-85) at 2, 24.)

---

[3] National Union issued CGL Policy No. 143-77-30 to Donaldson, effective July 31, 1996 to July 31, 1997. (Compl., Ex. A, Dec. 21, 2010, Docket No. 1.) National Union issued CGL Policy No. RMGL 143-84-85, effective July 31, 1997 to July 31, 1998. (Compl., Ex. B.) National Union issued CGL Policy No. RMGL 612-20-98, effective July 31, 1998 to July 31, 1999. (Compl., Ex. C.) National Union issued CGL Policy No. GL 612-30-28, effective July 31, 1999 to July 31, 2000. (Compl., Ex. D.)

[4] American Home issued CGL Policy No. GL 457-12-34 to Donaldson, effective July 31, 2000 to July 31, 2001. (Compl., Ex. E.) American Home issued Policy No. GL 457-12-34 for the period July 31, 2001 to July 31, 2002. (First Brownell Decl., Ex. 1.)

The policies cover property damage caused by "occurrences."[5]  Under the policies, property damage means:

a.      Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.      Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Am. Compl. for Declaratory J. ("Compl."), Ex. A at 18, June 28, 2011, Docket No. 45.)

The policies also contain a Batch Clause Endorsement, which combines certain property damage that might otherwise be subject to separate deductibles into one "occurrence."  The Clause states:

**Section V – Definitions [12/13] – Occurrence,** is amended to add new paragraph:

As respects "Products Completed Operations Hazard",[6] all . . . "property damage" arising out of and attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting one lot of goods or products manufactured, sold, handled or distributed by you or others trading under your name, shall be deemed to result from a single "occurrence."  Such "occurrence" will be deemed to occur with the first injury notified to you during the policy period.

---

[5] An "occurrence" is defined by the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Compl., Ex. A at 17.) Throughout this Order, the Court will cite to individual insurance policies that Plaintiffs issued to Donaldson.  Note that the language in the other insurance policies that Plaintiffs issued to Donaldson is the same, unless specified otherwise by the Court.

[6] "Products-completed operation hazards" is defined as "'property damage' occurring away from premises you own or rent arising out of 'your product' . . . ."  (Compl., Ex. A at 17.)

(Compl., Ex. A, at 58.)[7]  Thus, under the Batch Clause Endorsement, all property damage relating to a single occurrence is deemed to occur during the policy period in which the insured – here, Donaldson – is first notified of the injury.

### 2.     Federal and National Union's Umbrella Policies

Donaldson obtained six annual umbrella insurance liability policies from Federal between July 31, 1996 and July 31, 2002.  (Eighth Dierssen-Morice Decl., Exs. 7, 9.) National Union issued two commercial umbrella liability policies to Donaldson, one of which ran from July 31, 2001 to July 31, 2002.  (*See* Second Decl. of Matthew J. Fink ("Second Fink Decl."), Ex. E at 5, July 20, 2011, Docket No. 53.)

### C.     THE *BURROUGHS* SETTLEMENT

Shortly after the *Arender* claim was filed against Donaldson regarding the allegedly-defective air-intake ducts,[8] Donaldson notified American Home of the complaint.  On March 11, 2002, American Home's claims administrator sent a letter to Donaldson's third-party claims administrator, stating,

> [Due to the] Batch Clause Endorsement . . . all claims related to alleged faulty air intake systems on Western Star trucks would fall under one occurrence.  All the claims are subject to one deductible, and the limits of insurance for this occurrence are $1,000,000 . . . .  Per the Batch Clause

---

[7] It appears but is not entirely clear that the Batch Clause Endorsement was included in the American Home July 31, 2001 to July 31, 2002 policy.  (*See* First Brownell Decl., Ex. 1 at 5.)

[8] Several other actions have been filed against Donaldson for dusted engines, including, around the same time as the *Arender* complaint, *Sammie Bonner Construction Co., Inc. v. Western Star Truck Sales, Inc.*, Case No. 2001-162-M, in the Circuit Court of Choctaw County, Alabama.

> Endorsement, we have created a date of loss of November 14, 2001, the date on the first summons received by the insured. We have also combined the Arender and Bonner lawsuits under one claim number, [011811-003280-PB]. We suggest that you take similar steps regarding the date of loss and combination of all claims into one . . . . This matter has the potential to exceed the policy limit of $1,000,000, therefore, the umbrella and excess carriers have been placed on notice.

(First Brownell Decl., Ex. 5.)  Donaldson was copied on the letter.  (*Id.*)

On May 28, 2002, American Home's claims administrator sent Donaldson a letter stating that it would "defend Donaldson subject to a full reservation of all of its rights" and that providing the defense "shall not act as an estoppel or waiver of any of the rights arising out of the policy or law." (First Fink Decl., Ex. O (Corrected) at 5, June 2, 2011, Docket No. 35.)  The letter further stated that it only addressed coverage under the American Home 2001-2002 Primary Policy, and that Donaldson should submit claims for coverage under different policies separately.  (*Id.* at 2.)  On June 9, 2003, National Union's claims administrator also sent a letter to Donaldson purporting to reserve its rights.  (Second Fink Decl., Ex. E at 8.)[9]

From 2002 through the *Burroughs* settlement, a third-party claims administrator advanced payments to Donaldson for defense costs and settlements under the claim number 011811-003280-PB, all of which Plaintiffs approved.  (Decl. of Martin R. Kohne ¶ 13, May 2, 2011, Docket No. 18.)  In early 2009, the state court scheduled a mediation

---

[9] The letter declared, among other reservations, "National Union's determination as to coverage as available to your company under the commercial umbrella policy is based upon the facts as presently known to us.  As a result, we reserve our right to modify our coverage position upon receipt of additional information.  All legal and policy defenses that National Union may have in connection with this matter, whether stated or not in this correspondence, are hereby reserved."  (Second Fink Decl., Ex. E at 8.)

regarding the *Burroughs* cross-claim for October 15, 2009.  *(Id.* ¶¶ 14-15.)  On July 22, 2009, Donaldson advised Plaintiffs' attorney of the mediation.  (First Fink Decl., Ex. P.)  From July to September 2009, at the request of Plaintiffs, Donaldson provided copies of depositions, discovery, and pleadings related to the cross-claim.  Plaintiffs argue that this was the first time they learned of certain issues relevant to Donaldson's claim, such as when Donaldson first received notice of the property damage.

The October 15 mediation failed.  According to Donaldson, this was "in large part due to [Plaintiffs'] refusal to offer realistic sums to the *Burroughs* plaintiff to settle the case."  (Kohne Decl. ¶ 16.)  According to Donaldson, Plaintiffs "offered paltry sums" at the settlement conference and put their own interests ahead of Donaldson.  (Donaldson Countercl. ¶ 140.)

In early 2010, the *Burroughs* cross-claim settled.  (Aff. of Lindsay G. Arthur ("Second Arthur Aff."), Ex. 1 (*Burroughs* settlement agreement), Sept. 26, 2011, Docket No. 100; Compl. ¶ 38.)  National Union contributed a total of $3,548,387.10 and Federal contributed $2,451,612.90.  (Second Arthur Aff. at 4.)  Donaldson and Burroughs signed the settlement agreement, which provided, "Donaldson and its insurers shall have no further obligation."  (*Id.*)  Although the insurance companies' payment obligations were outlined in the settlement, no insurance company was a signatory to the settlement and the settlement only stated that it "contain[ed] the entire agreement between Burroughs and Donaldson . . . ."  (*Id.* at 7-8.)  On June 30, 2010, Plaintiffs sent Donaldson an invoice seeking repayment from the settlement in the amount of almost $2.5 million. (Donaldson Countercl. ¶¶ 145-46.)

Prior to the *Burroughs* settlement, Federal and Plaintiffs had disputed the amount they should each contribute.  On February 9, 2010, Matthew Fink, coverage counsel for Plaintiffs, sent an e-mail to Michael Simmons, coverage counsel for Federal, about the *Burroughs* cross-claim.  (Decl. of Cody S. Moon ("Moon Decl."), Ex. E, Oct. 24, 2011, Docket No. 110.)  The e-mail stated that Plaintiffs were:

> [W]illing to pay additional sums allocable to [Federal] to attempt to settle the case under a reservation of rights.  I requested [to your associate] that if [Federal has] an objection with the mediation continuing in this matter or an objection as to the reasonableness of the settlement offers that [Federal] make its objection known.  I was informed that [Federal has] no position as it was still evaluating coverage and the liability/damage exposure presented by the case.  Therefore, [your associate] expressed to me that [Federal] was neither agreeing to nor objecting to the reasonableness of the settlement or the manner in which the mediation was proceeding.
>
> [Federal] has been on notice of this claim in excess of six months.  [Plaintiffs] believe[] that [Federal] has had a sufficient time to evaluate the coverage issues and liability/damages exposure in the underlying case.  [Plaintiffs] will proceed to protect [their] insured's interests and reserve[] the rights to recoup any settlement payment that is allocable to [Federal].

(*Id.*)

Simmons responded on February 9, 2010 stating, "Do not presume to tell me [Federal] has had sufficient time to consider coverage issues" and "We will disclose our coverage position when it has been finalized."  (Moon Decl., Ex. F.)  Simmons's e-mail acknowledged that Plaintiffs "had changed [their] position three weeks before a mediation, taking $25 million in primary coverage off the table and the position that it now has only $3 million in primary coverage."  (*Id.*)  It further recognized that policy years prior to 2001-2002 were potentially implicated by Plaintiffs' position.  (*Id.*)

On February 18, Simmons sent a letter to Fink and Donaldson's lawyer outlining Federal's willingness to contribute to the settlement.  (Moon Decl., Ex. G.)  It also stated, "The foregoing offer to contribute to settlement is made . . . with a full reservation of all rights against all parties, both under Federal's policies and applicable law."  (*Id.*) Plaintiffs allege that, on February 19, Plaintiffs and Federal had a telephone conversation in which they again reserved all rights against each other to seek additional contribution. (*See* Moon Decl., Ex. H.)  On February 22, Plaintiffs' authorized representative sent Federal's authorized representative an e-mail describing the exact dollar amounts proposed for the settlement of the *Burroughs* counter-claim.  (*Id.*)  The e-mail stated, "Please note that [Plaintiffs have] reserved all rights in this matter; and [we] acknowledge[] that [Federal] has reserved all rights as well."  (*Id.*)

### D.    STATUS OF DISCOVERY

In 2011, each party filed a summary judgment motion seeking reimbursement for contributions to the *Burroughs* settlement or a declaration that other parties were not entitled to reimbursement.  At that time, the Court found that the motions were premature and that more discovery was needed.  (*See* Mem. Op. & Order, Mar. 30, 2012, Docket No. 122.)  The Court denied all summary judgment motions at that time to allow for greater discovery.  Fact discovery has now closed in this case, (*see* Order at 4-5, Jan. 10, 2014, Docket No. 265), and the parties have filed new motions for summary judgment, along with two motions to exclude expert testimony and Plaintiffs' motion for judgment on the pleadings.

**ANALYSIS**

I.    **JUDGMENT ON THE PLEADINGS**

A.    **Standard of Review**

Plaintiffs bring a motion for judgment on the pleadings with respect to each of the three counterclaims asserted by Donaldson.  Reviewing a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Court applies the same standard as under a motion to dismiss pursuant to Rule 12(b)(6). *Clemons v. Crawford,* 585 F.3d 1119, 1124 (8th Cir. 2009).  Therefore, when considering a motion under Rule 12(c), the Court must "'accept as true all factual allegations set out in the complaint' and . . . 'construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [their] favor.'"  *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).  Although a complaint need not contain "detailed factual allegations," it must contain sufficient factual allegations "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In addition to the pleadings, the Court may properly consider materials that are necessarily embraced by the pleadings.  *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

B.    ***Burroughs* Settlement Timing**

Plaintiffs move for judgment on the pleadings on two grounds.  The first, as to Counts I and II of Donaldson's counterclaim, is based on timing.  They argue that

Donaldson sought a declaration allocating the *Burroughs* settlement to the 2001-2002 American Home policy, but that Donaldson now contradicts its own counterclaim with its discovery responses showing that the settlement should be allocated to the 1999-2000 National Union policy.   Consequently, Plaintiffs assert that these claims should be dismissed.

Counts I and II of Donaldson's counterclaim – declaratory judgment and breach of contract claims, respectively – allege that damages arising from the *Burroughs* cross-claim must be treated as a single occurrence under the 2001-2002 Batch Clause Endorsement, triggering a single $500,000 deductible for Donaldson.   (Donaldson Countercl. ¶¶ 157-62.)  Donaldson declares that it "is entitled to a declaratory judgment that [Plaintiffs] owe[] a duty to completely indemnify Donaldson for all damages arising from the property damage . . . claimed in the *Arender* Complaint and the *Burroughs* Cross-Claim, under the 2001-2002 Policy and the National Union Umbrella Policy, and apply a single $500,000 deductible."  (*Id.* ¶ 158.)   Additionally, Donaldson seeks damages for Plaintiffs' "refus[al] to completely indemnify Donaldson for the settlement of the *Burroughs* Cross-Claim under the 2001-2002 Policy."  (*Id.* ¶ 161.)  Specifically, Donaldson's counterclaim rejects the notion that Donaldson owes "a deductible for each of the policies issued between 1996 and 2001," claiming that "those policies do not apply."  (*Id.*)

Late in the discovery process, however, Donaldson altered this position, maintaining instead that all loss pursuant to the *Burroughs* cross-claim litigation was properly allocated to the 1999-2000 policy year as a single occurrence.  (Donaldson's

Opp'n to Federal's Mot. to Compel Resps. to its Am. Disc. Reqs. at 3 & n.1, Dec. 4, 2013, Docket No. 248.)   Donaldson's obligations under the 1999-2000 policy period would be no different than its obligations under the 2000-2001 policy period; under both policies, Donaldson was responsible for a $500,000-per-occurrence deductible.  (Compl., Ex. D (1999-2000 policy) at 71; *id.*, Ex. E (2000-2001 policy) at 62.)  But Federal's and Plaintiffs' obligations would significantly change, as Plaintiffs "would likely owe only $500,000 of the $6 million settlement amount, with Federal paying the remaining loss." (*Id.*)

By relying on Donaldson's late change as to which policy year is correct, Plaintiffs undermine their own motion.  Courts approach a motion for judgment on the pleadings no differently from a motion to dismiss under Rule 12(b)(6).  When ruling on a 12(b)(6) motion to dismiss, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Accordingly, although "courts are not strictly limited to the four corners of [the pleadings]," they are restricted to considering the pleadings along with documents "contemplated by or expressly mentioned in [the pleadings]."  *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013).  In this case, for example, materials such as the insurance policies themselves may be properly considered in a Rule 12(c) analysis, because they are referenced in the pleadings.  However, "matters outside the pleadings" may not be considered when evaluating a motion for judgment on the pleadings without

turning the motion into one for summary judgment under Rule 56.  *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007).

Here, Plaintiffs rely on Donaldson's opposition to a motion to compel discovery responses.  This falls well outside the pleadings and the documents expressly contemplated by the pleadings.  Indeed, the document did not even exist at the time the pleadings were submitted to the Court.  Accordingly, the Court will not consider the discovery responses at this stage in the litigation.

But under a Rule 12(c) analysis, Plaintiffs would not be entitled to judgment on the pleadings even if the Court were to consider Donaldson's discovery responses.  In ruling on a motion for judgment on the pleadings, the Court "accept[s] as true all factual allegations set out in the [pleadings]."  *Wishnatsky*, 433 F.3d at 610.  Were the Court to accept as true all facts pled in Counts I and II of Donaldson's counterclaim, the Court would be treating the property damage in the *Burroughs* litigation as allocable to the 2001-2002 policy period and Donaldson as indemnified for all damages above a single $500,000 deductible.  This is the opposite of the finding Plaintiffs now seek from the Court.  Plaintiffs' contention is not that Donaldson's counterclaim fails to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  They do not assert that the deficiency in Donaldson's counterclaim is that it is a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," *id.*, which would be an appropriate critique at a Rule 12(b)(6) or Rule 12(c) stage.  Rather, Plaintiffs ask the Court to find that the facts as stated in Donaldson's

counterclaim, although pled with adequate specificity, are **not** true, as Donaldson's later discovery responses and subsequent submissions to the Court appear to concede. Because Plaintiffs rely on a theory that is incompatible with the analysis the Court must perform when evaluating a motion for judgment on the pleadings, the Court will deny Plaintiffs' motion as to the timing of the *Burroughs* settlement alleged in Counts I and II of Donaldson's counterclaim.

### C.    Recoverable Damages

Plaintiffs also seek a judgment on the pleadings as to Counts II and III of Donaldson's counterclaim, on the grounds that Donaldson has not identified any recoverable damages resulting from its claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs allege that Donaldson has only identified attorneys' fees and costs as its damages, which are not recoverable in the absence of an insurer's failure to defend the insured. Plaintiffs assert that they did not fail to defend Donaldson, their insured, and thus attorneys' fees and costs are not sufficient damages to entitle Donaldson to relief. Donaldson disputes this allegation, claiming that it is entitled to recover attorneys' fees and seeking additional damages beyond attorneys' fees and costs, including "damages from [Plaintiffs'] failure to settle in a timely manner, which resulted in a higher settlement amount . . . ." (Donaldson's Mem. in Opp'n to Pls.' Mot. for J. on the Pleadings at 14, July 22, 2014, Docket No. 317.) Because the Court finds that Counts II and III of Donaldson's counterclaim allege

damages beyond attorneys' fees and costs, resulting from Plaintiffs' handling of the *Burroughs* litigation, the Court will deny Plaintiffs' motion.

If one party breaches a contract or the covenant of good faith and fair dealing, damages are available for the injured party. Although Donaldson's counterclaim does not allege a specific amount of damages, Count II alleges that Plaintiffs breached their contract with Donaldson by refusing to completely indemnify Donaldson for the *Burroughs* litigation settlement. (Donaldson Countercl. ¶ 161.) As a consequence of the breach, Donaldson claims damages in an amount to be determined at trial. (*Id.* ¶ 162.) Further, Donaldson alleges that Plaintiffs breached the covenant of good faith and fair dealing by only warning Donaldson late in this litigation that multiple policy years may be implicated by the *Burroughs* cross-claim and by failing "to properly separate the claims handling responsibilities from individuals also involved in asserting [Plaintiffs'] coverage positions." (*Id.* ¶¶ 166-69.)

"[A]ccept[ing] as true all factual allegations set out" in Donaldson's counterclaim, *Wishnatsky*, 433 F.3d at 610, the Court finds that Donaldson would be entitled to damages in addition to attorneys' fees and costs. Donaldson is not required at the pleading stage to prove those damages. Rather, it must adequately plead the causes of action in a fashion that gives Plaintiffs "fair notice of what the . . . claim is and the grounds upon which it rests." *Iqbal*, 556 U.S. at 698-99 (internal quotation marks omitted). The Court finds that Donaldson has done so.

Here again, Plaintiffs challenge Donaldson's pleadings with evidence from discovery to support their argument. In particular, Plaintiffs point to Donaldson's

response to Interrogatory Number 11.  (*See* Am. Decl. of Matthew J. Fink ("Am. Fink Decl."), Ex. B at 2, Aug. 5, 2014, Docket No. 338 ("Separately itemize all amounts that You seek to recover from National Union and/or American Home in Your Counterclaim.").)   In its response to Plaintiffs' Interrogatory Number 11, Donaldson stated:

> Donaldson's investigation into the exact amount of its damages is ongoing. The general categories of damages that Donaldson is seeking include but are not limited to, attorneys' fees, costs and other ongoing legal and consequential damages, the total amount of which is still to be determined.

(*Id.*)   Donaldson then listed two specific "amounts presently ascertainable," both of which are attorneys' fees and costs.   (*Id.*)   Plaintiffs also point to recent deposition testimony by Amy Becker, Donaldson's General Counsel:

> Q:     What are Donaldson's damages that it claims in its cross claim other than Maslon's attorneys['] fees which were incurred between September 2009 and March 2010 – excuse me – May 2010?
>
> A:     The attorney's fees that we have spent on this lawsuit as well.
>
> Q:     Anything else?
>
> A:     I do not believe so.

(Pls.' Suppl. Reply in Supp. of Mot. for J. on Pleadings at 1, Oct. 9, 2014, Docket No. 355 (emphasis removed) (quoting Letter to Magistrate Judge, Ex. A (Dep. of Amy Becker ("Becker Dep.")) at 9:12-20, Sept. 26, 2014, Docket No. 345).)

As with Donaldson's opposition to the motion to compel discovery, interrogatory responses and recent deposition testimony are outside the realm of documents "contemplated by or expressly mentioned in [the pleadings]."  *Dittmer Props.*, 708 F.3d at 1021.   As such, they are not properly contemplated by the Court on a motion for

judgment on the pleadings.  *McAuley*, 500 F.3d at 787.  Therefore, the Court will not take into account Donaldson's response to Plaintiffs' Interrogatory Number 11 or Becker's deposition testimony when ruling on this motion.

Based on the content of Donaldson's counterclaim and the documents it expressly contemplates, the Court concludes that Donaldson has adequately alleged recoverable damages – specifically, damages flowing from Plaintiffs' alleged breach of contract and duty of good faith and fair dealing in the *Burroughs* settlement handling.  (Donaldson's Countercl. ¶¶ 161-62, 166-69.)  In the Court's view, Counts II and III of Donaldson's counterclaim, while neither lengthy nor rich in detail, sufficiently identify for Plaintiffs the nature of and basis for Donaldson's claims and damages allegations.  Because Donaldson has adequately pleaded its counterclaim and would be entitled to some amount of damages if its factual allegations were found to be true, the Court will deny Plaintiffs' motion for judgment on the pleadings.[10]

## II.    SUMMARY JUDGMENT

Plaintiffs, Federal, and Donaldson bring summary judgment or partial summary judgment motions.  The parties all seek a determination by the Court as to the number of

---

[10] The parties devote substantial time in their memoranda to the question of whether Donaldson has proven damages aside from attorney's fees and costs, and whether attorneys' fees and costs alone constitute recoverable "damages."  In the context of this discussion, they dispute choice of law – namely, whether Minnesota law or Mississippi law should govern, given that the two states appear to contemplate different rules and exceptions to this issue.  In this case, however, the Court concludes that Donaldson adequately pled damages in its counterclaim, regardless of whether attorneys' fees alone would constitute recoverable damages, because Donaldson has alleged breach of contract damages.  For this reason, and because the Court will not consider at this stage any later discovery documents outside the pleadings relating to the type of damages Donaldson has actually proven, the Court will not reach the choice of law issue or address the question of whether attorneys' fees alone constitute recoverable damages.

"lots" implicated by the *Burroughs* cross-claim.  Relatedly, the parties request that the Court establish when the relevant occurrence or occurrences took place – that is, when the *Burroughs* litigation property damage occurred and when Donaldson was notified about it.

## A.    Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B.    Number of Lots

The first issue on which each party moves for summary judgment is the number of "lots" involved in the *Burroughs* cross-claim litigation.  Donaldson contends that "one 'lot,' or at most, two 'lots' [are] at issue under the Batch Clause Endorsement." (Donaldson's Mem. in Supp. of Mot. for Partial Summ. J. ("Donaldson's Summ. J. Mem. in Supp.") at 9, July 1, 2014, Docket No. 277.)  Plaintiffs agree with Donaldson that "[t]he property damage at issue in the *Burroughs* cross-claim arose out of a design defect

affecting **one** 'lot' of ducts manufactured, sold, handled or distributed by Donaldson." (Mem. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Summ. J. Mot.") at 1-2, July 1, 2014, Docket No. 308 (emphasis added).)   Plaintiffs and Donaldson also agree that the one lot corresponds to one "occurrence" under the Batch Clause Endorsement and ask the Court to find that that occurrence relates only to the 1999-2000 policy period.   (Pl.'s Summ. J. Mot. at 1; Donaldson's Summ. J. Mem. in Supp. at 15, 19-20, 38-39.)

In contrast, Federal asserts that there are "no fewer than 22 aggregated-by-lot occurrences" based on property damage to forty-eight trucks, and Donaldson receiving notice of the damage on seven occasions during the 1999-2000 policy period, ten occasions during the 2001-2002 policy period, and five occasions during the 2009-2010 policy period.   (*See* Federal's Mem. in Supp. of Mot. for Summ. J. at 26, July 1, 2014, Docket No. 289.)   Federal identifies these occurrences and their timing by maintaining that a new "batch" or "lot" commenced each time the molds for the air-intake ducts were dismantled during a break in production and then later reassembled to continue production, even if the molds were the same and the product designs and materials were unchanged.   (*See id.* at 8-9, Fourth Arthur Aff., Ex. 1.)

The Court's March 30, 2012 order defined both "lot" and "occurrence."   In interpreting the terms included within the insurance policies, the Court explained that if a policy is unambiguous, the court must give the language its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life. Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986).   If the policy language is ambiguous, the ambiguity must be resolved in favor of the insured.  *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32,

36 (Minn. 1979).  Policy language is ambiguous if it is subject to two or more reasonable interpretations.  *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997).  Policy words of inclusion are broadly construed, and words of exclusion are narrowly considered.  *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009).

As to "lot," the Court found that the term "applies to each type of unique product as a distinct group, kind, or sort . . . [and] does not contain an arbitrary temporal limitation."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.*, No. 10-4948, 2012 WL 1072329, at *14 (D. Minn. Mar. 30, 2012).  The Court noted that the application of the term to Donaldson's products would require information about, for example, the products' specifications, product numbers, and base materials.  *Id.*  Further, the Court defined "occurrence" by adopting the Batch Clause Endorsement's interpretation:

> "[P]roperty damage" arising out of and attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting **one lot** of goods or products manufactured, sold, handled or distributed by you or others trading under your name, **shall be deemed to result from a single "occurrence."**

*Id.* at *3, *14 (emphasis added).

Although the Court denied the parties' summary judgment motions in 2012 because the Court lacked critical information to apply these definitions to Donaldson's products, discovery is now essentially complete in this case.  Applying the Court's definitions to the information generated by the parties, the Court finds that there were two lots of air-intake ducts responsible for the underlying harm in the *Burroughs* litigation –

one manufactured and sold as product number 317, and one manufactured and sold as product number 319.   The two products are similar, but the Court concludes that differences in their product numbers, specifications, and base materials are significant enough to treat each as a distinct group, kind, or sort, and, therefore, a separate lot.

First, and perhaps most notably, Donaldson itself drew a distinction between the products when it assigned them unique product numbers.   By designating one product "number 317" and the other "number 319," Donaldson signaled that they were at least internally considering the products to be part of two separate groups.   One difference that may have warranted this separate grouping is the size of the ducts.   Although Donaldson maintains that the design specifications for the two products were virtually identical and that neither design notably changed during the relevant time period, one duct was considerably longer than the other.   (Eighth Dierssen-Morice Decl., Ex. 5 (Dep. of Donald F. Engel) at 18-21, 27-29 (describing the process of revisions to product numbers 317 and 319 and stating that "[n]one of these [design specification revisions] had significant changes ever."); *id.*, Exs. 16-17 (Product Summary Reports for product numbers 317 and 319).)

In addition to product numbers and specifications, the base materials or composition of the products is also relevant to the "lot" inquiry.   For much of the relevant time, product numbers 317 and 319 had identical chemical compositions.   In 1999, the Centro facility in Horicon, Wisconsin made a change to the base material – HDPE Crosslink resin – for product number 319, altering the particle size of the HDPE Crosslink powder form that went into the product mold.   (Eighth Dierssen-Morice Decl.,

Ex. 17 at 66; Lewis Dep. at 67:15-71:22.)   Although the new powder was "chemically identical" to the previous resin, the alteration affected the particle size of the resin's powder form and thus represents a change in base material.   (Eighth Dierssen-Morice Decl., Ex. 28 at 68.)   This change appears to have been implemented only for product number 319.

Based on the general similarities but handful of notable differences between product numbers 317 and 319, the Court concludes that the two product numbers represent separate lots.   Within each product's manufacturing history, however, the numbers, specifications, and base materials[11] have remained the same.   Each duct produced throughout the relevant time period under product number 317, or product number 319, is of the same kind, sort, or group as the other ducts manufactured under that same product number.   Therefore, the Court will treat the ducts manufactured under product number 317 as constituting one lot, and those manufactured under product number 319 as constituting a second, distinct lot.

Federal does not dispute the underlying facts, but it concludes that there were twenty-two lots by applying a different definition of "lot" than the one established by the Court – one proposed by Federal's experts.   Federal's alternative definition considers one "lot" to be "a logical grouping of units of a product that are: 1. of uniform characteristics and quality; 2. manufactured under essentially identical conditions; 3. manufactured

---

[11] The 1999 HDPE Crosslink resin change at Centro is the sole exception.   As there is no evidence that the change impacted the make-up of the number 319 ducts in a manner relevant to this litigation, though, the Court does not deem this alteration to require the establishment of a new "lot."

within manufacturing specifications; and 4. within a finite time period." (Aff. of Lindsay G. Arthur, Jr. ("Fourth Arthur Aff."), Ex. 5 (Okey/Nugent White Paper) at 115, July 22, 2014, Docket No. 322.) As this is not an issue of material fact but rather an application of a term of art to undisputed facts, the Court will reject Federal's proposed definition of a "lot" or "batch" for two reasons. First, the Court already established a definition of the term "lot" in its March 30, 2012 order, making Federal's definition contrary to the Court's prior determination on this point. Second, Federal's experts' definition ignores plain meaning in favor of technical criteria used outside the insurance industry. (Eighth Dierssen-Morice Dep., Ex. 31 (Dep. of Paul Nugent ("Nugent Dep.")) at 33:5-14.) Minnesota courts reject such definitions. *See Volk v. Ace Am. Ins. Co.*, 748 F.3d 827, 828-29 (8th Cir. 2014) ("Minnesota courts rely on dictionaries for the plain and ordinary meaning of an undefined term." (citing *Wozniak Travel*, 762 N.W.2d at 577-79)). This Court will do the same.

Federal's alternative definition is incompatible with the Court's, and the Court will therefore not consider it when deciding the number of "lots." Because the Court finds that there is no genuine issue of material fact as to the number of lots under the Court's definition, the Court will grant in part Donaldson's motion for summary judgment insofar as it seek a determination that there are two lots involved in the *Burroughs* litigation. Consequently, in light of the express wording of the Batch Clause Endorsement that harm arising out of the same "lot" shall be deemed to be part of the same occurrence, the Court finds that there are two "occurrences." The Court will deny Plaintiffs' motion for summary judgment seeking a finding that there was one lot. The Court will also deny

Federal's motion for summary judgment seeking a finding that there were twenty-two lots.

### C.      Timing of Notice to Donaldson

A second, related issue is **when** Donaldson received notice of the *Burroughs* property damage.   Here, as well, there remain no genuine issues of material fact. Donaldson and Plaintiffs agree that Donaldson was first notified of the property damage – relating to both product number 317 and product number 319 – in January 2000, when Western Star representative Dennis Trittin contacted Donaldson.   (Eighth Dierssen-Morice Decl., Ex. 4.)  Although Federal maintains that Donaldson received "first notice" of damage on seven different occasions, that number depends on a finding that there were at least seven occurrences.  Federal concedes that Donaldson received the earliest notice of the damage during the 1999-2000 policy period, which aligns with the time at which Trittin called Donaldson.   Because there is no evidence supporting a finding that Donaldson received notice prior to Trittin's report, and no party contends that Trittin's call does not constitute notice to Donaldson, the Court will find that Donaldson received notice of the property damage underlying both the product number 317 and number 319 occurrences during the 1999-2000 policy period.

## III.    DAUBERT MOTIONS

### A.     Standard of Review

Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citations and internal quotation marks omitted). The district court has a gate keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

The Supreme Court in *Daubert* outlined particular factors for courts to consider in assessing reliability, such as (1) whether the opinion is based on scientific knowledge, is susceptible to testing, and has been tested; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology; and (4) whether the theory has been generally accepted by the scientific community. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (summarizing *Daubert* factors). However, in *Kumho Tire*, the Court explained that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court

the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 141-42. The reliability inquiry is designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire*, 526 U.S. at 152).

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* at 758; *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

**B.      Paul Nugent and Chris Okey**

Donaldson seeks to exclude the testimony of Chris Okey and Dr. Paul Nugent, Federal's experts on the number of "lots" involved in the *Burroughs* cross-claim litigation. Okey and Nugent are the source of Federal's definition of the term "lot."[12] They apply this definition to the manufacturing process at Donaldson's facilities to conclude that there was "a minimum of 22," and more likely at least 52, separate

---

[12] "[A] logical grouping of units of a product that are: 1. of uniform characteristics and quality; 2. manufactured under essentially identical conditions; 3. manufactured within manufacturing specifications; and 4. within a finite time period." (Second Arthur Aff., Ex. 5 at 115.)

"batches" or "lots" of product numbers 317 and 319.  (Fourth Arthur Aff., Ex. 5 at 108, 151.)  This conclusion is driven by Okey and Nugent's view that each dismantling and reassembly of Donaldson's molds and equipment constituted a break in production and a new lot.  (*See id.* at 119-36.)

Although the Court finds that Okey and Nugent are highly qualified to testify about the rotational molding process used to manufacture products like Donaldson's ducts, their testimony is unnecessary and potentially confusing to the jury because it introduces and relies on a definition of "lot" that the Court has rejected.  Okey and Nugent have ample experience to testify about the rotational molding process.  Dr. Nugent has spent decades researching, developing, and consulting on rotational molding systems.  (*Id.*, Ex. 2 at 65.)  As the owner of two U.S. patents on rotational molding apparatuses, the author of a guide to the process of rotational molding, and a member of several professional organizations related to rotational molding, he is unquestionably an expert in the field.  (*Id.* at 65-69.)  Okey is also highly qualified, having overseen product design and manufacturing for many years at Honeywell, followed by work in the area of injection molding and systems compliance at St. Jude Medical.  (*Id.*, Ex. 3 at 71-74.)  Based on their extensive experience, the Court finds both Okey and Nugent to be well-qualified to testify on the rotational molding manufacturing process Donaldson implemented for product number 317 and 319.

In addition to being highly qualified, Okey and Nugent reviewed extensive materials in preparing their white paper.  In preparation for their testimony, they studied, among other materials, the Product Summary Reports for product numbers 317 and 319

and reviewed the revision history, special instructions, molds, assembly equipment, assembly instructions, engineering drawings, and product and finish inspections. (*Id.*, Ex. 5 at 116.) Donaldson argues that Okey and Nugent's testimony should be excluded because they did not perform any testing on the manufacturing equipment or observe the manufacturing process at the Centro or MSCA facilities. The Court does not find these arguments persuasive. Challenges to the factual support for Okey and Nugent's conclusions more appropriately would go to the weight of their opinions than the admissibility. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001); *In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.*, 493 F. Supp. 2d 1082, 1088 (D. Minn. 2007). The breadth of these materials, in combination with Okey and Nugent's experience with rotational molding and batch manufacturing systems, provides a sufficient basis for Okey and Nugent to reach conclusions about Donaldson's manufacturing process.

The Court will grant Donaldson's motion to exclude their testimony, however, because the Court concludes that it would be unnecessary and potentially confusing for the jury. Federal's purpose in retaining Okey and Nugent was to determine the number of lots of Donaldson's products. Their proposed testimony and expert conclusions are devoted to devising a definition of the term "lot" and then applying that term to the facts of Donaldson's production system. Federal asserts that this is the proper province of expert testimony because the Court may determine a legal definition of a term such as "lot" but may not make a factual determination of when "actual injury" occurs. *See*

*Donnelly Bros. Const. Co., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 759 N.W.2d 651, 655-56, 658 (Minn. Ct. App. 2009).

In this case, however, Okey and Nugent do not purport to apply the Court's definition of "lot" to the facts of Donaldson's manufacturing process. Indeed, Okey and Nugent's white paper never mentions or discusses the Court's definition of the term "lot." Their conclusions rely solely on their constructed definition that the Court has rejected. The proffer of a unique definition of the term "lot" is problematic first and foremost as an effort to define a term with legal significance under the insurance policies at issue in this case. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *see also Thomas Noe, Inc. v. Homestead Ins. Co.*, 173 F.3d 581, 583-84 (6th Cir. 1999) (finding an expert report on an insurance policy term to be inadmissible because "an opinion on a legal matter – the proper interpretation of an insurance policy – [] is well within the competence of the court"). Further, because the remainder of Okey and Nugent's proposed testimony relates to the application of an improper definition, allowing them to testify about their findings would risk confusing the jury about the appropriate definition in this case.

As a result, the Court finds that Okey and Nugent's testimony is both unnecessary – because the Court has already defined the relevant term – and potentially misleading – because it concerns the application of an alternative definition of that term. Consequently, the Court will grant Donaldson's motion to exclude Okey and Nugent's testimony.

### C.      Samuel J. Ward

Finally, Donaldson has proposed testimony by Samuel J. Ward, the Quality Leader

at the MSCA facility in Indiana, to rebut Okey and Nugent's testimony.  As topics for

Ward's testimony, Donaldson identified their manufacturing process for product numbers

317 and 319, as well as how the products were or were not segregated into "lots" or

"batches," and the revisions process and conditions under which the products were

manufactured.  Federal moves to exclude Ward's testimony on the basis that he is not

qualified as an expert because he has no education in rotational molding and has only

limited experience with the manufacturing process.  Federal further requests that the

Court limit Ward's testimony as a lay witness, stressing that although a lay witness may

gain personal knowledge of facts "through review of records prepared in the ordinary

course of business, or perceptions based on industry experience," *Burlington N. R.R. Co.*

*v. State of Nebraska*, 802 F.2d 994, 1004 (8th Cir. 1986), the witness may not "respond to

hypothetical facts or circumstances" and may not review documents from outside the

witness's own business or industry experience.  *Hartzell Mfg., Inc. v. Am. Chem. Tech.,*

*Inc.*, 899 F. Supp. 405, 409 (D. Minn. 1995).  Federal asks that, accordingly, Ward's

testimony be limited to his own personal knowledge and experience from observations at

the MSCA facility and the manufacturing of product 317 rather than allowing Ward to

comment on what constitutes a "lot" with regard to Donaldson's products.

As the Quality Leader at the MSCA manufacturing facility, Ward is intimately

familiar with the manner in which Donaldson's products are manufactured.  The Court

concludes that Ward, like Okey and Nugent, would be abundantly qualified to describe

the rotational molding process or testify to the manner in which Donaldson manufactured product numbers 317 and 319.  The Court will grant Federal's motion insofar as it relates to Ward's rebuttal of Okey and Nugent's testimony, as their testimony will be excluded. Rebuttal testimony is therefore unnecessary.  The Court denies Federal's motion to the extent it seeks to exclude Ward from testifying as a lay witness about his experience with the duct manufacturing process at the MSCA facility.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Donaldson's Motion for Partial Summary Judgment [Docket No. 275] is **GRANTED in part** and **DENIED in part**, as follows:

    a.      The motion is **GRANTED** as to the request that the Court enter a declaratory judgment that there were two lots of Donaldson's products and that Donaldson received notice of the underlying property damage during the 1999-2000 policy period.

    b.      The motion is **DENIED** as to the request that the Court determine that Donaldson's deductible contribution obligations have been fulfilled or are capped at a particular additional amount.

2.      Plaintiffs' Motion for Judgment on the Pleadings [Docket No. 295] is **DENIED**.

3.      Defendant Federal Insurance Company's Motion for Summary Judgment [Docket No. 286] is **DENIED**.

4.      Plaintiffs' Motion for Partial Summary Judgment [Docket No. 306] is **DENIED**.

5.      Defendant Federal Insurance Company's Motion to Exclude Expert Testimony of Samuel J. Ward [Docket No. 278] is **GRANTED** to the extent it relates to rebuttal of Chris Okey and Paul Nugent's testimony;

6.      Defendant Donaldson's Motion to Exclude Testimony from Chris Okey and Paul Nugent [Docket No. 288] is **GRANTED**.

7.      The Court's calendar clerk shall schedule a status conference for the purpose of ascertaining the most appropriate manner in which to proceed with the damages phase.


DATED:  March 23, 2015                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                         United States District Judge