# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and AMERICAN HOME ASSURANCE COMPANY, | Civil No. 10-4948 (JRT/TNL) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| DONALDSON COMPANY, INC., and FEDERAL INSURANCE COMPANY, | |
| Defendants. | |

Cody S. Moon, **NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP**, 71 South Wacker Drive, Suite 4400, Chicago, IL 60606, and Patrick D. Reilly, **ERSTAD & RIEMER, PA**, 8009 34th Avenue South, Suite 200, Minneapolis, MN 55425, for plaintiffs.

David J.F. Gross and Rikke A. Dierssen-Morice, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for Donaldson Company, Inc.

Sarah E. Bushnell, **ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, PA**, 81 South Ninth Street, Suite 500, Minneapolis, MN 55402, for Federal Insurance Company.

This Order addresses the longstanding litigation between an insurer, AIG,[1] and an insured, Donaldson Company, Inc. ("Donaldson"), over the proper application of commercial general liability ("CGL") policies AIG issued to Donaldson over a number of years. In prior orders, the Court has resolved AIG's claims against Donaldson, the focus

---

[1] The Court refers to Plaintiffs National Union Fire Insurance Company of Pittsburgh ("National Union") and American Home Assurance Company ("American Home") collectively as "AIG."

of which were AIG's efforts to recover additional deductibles from Donaldson. Donaldson also asserted counterclaims against AIG seeking declaratory relief regarding the proper interpretation of the CGL policies and alleging that in the course of handling Donaldson's claims, AIG breached the insurance policies and the covenant of good faith and fair dealing. AIG now moves for summary judgment on Donaldson's counterclaims.

The Court will grant the summary judgment motion for the following reasons. First, the Court has already decided on the correct interpretation of the contracts in prior orders in a manner that differs from Donaldson's counterclaim for declaratory relief; therefore, it will grant AIG's motion as to that claim. Second, the Court will grant the motion as to Donaldson's breach-of-contract claim because Donaldson does not seek recoverable damages and AIG's filing of the instant lawsuit was not a breach of contract. Finally, the Court will also grant the motion as to the claimed breach of the covenant of good faith and fair dealing for two reasons: there is insufficient evidence of bad faith, and Mississippi law regarding an insurer's duties to an insured are inapplicable under Minnesota's choice-of-law rules.

## BACKGROUND

### I.  THE PARTIES

Plaintiffs are two related insurance companies – National Union and American Home. National Union is a Pennsylvania corporation with its principal place of business in New York, while American Home is a New York corporation with its principal place of business in New York. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Donaldson Co.* (*Donaldson I*), No. 10-4948, 2012 WL 1072329, at *2 (D. Minn. Mar. 30, 2012); (Am.

Compl. ¶¶ 3-4, June 28, 2011, Docket No. 45). Donaldson is a Delaware corporation with its principal place of business in Minnesota. (Am. Compl. ¶ 5.)[2]

## II.    DONALDSON'S INSURANCE POLICIES

AIG companies insured Donaldson from July 31, 1996 to July 31, 2002, with largely identical consecutive annual CGL policies. *Donaldson I*, 2012 WL 1072329, at *2. Each policy contained a $1,000,000 per-occurrence limit and a $500,000 per-occurrence deductible for bodily injury or property damage. *Id.* The policies imposed on AIG (1) a duty to defend Donaldson in actions seeking damages for property damage caused by an occurrence, and (2) a duty to "pay those sums [Donaldson] becomes legally obligated to pay as damages because of . . . 'property damage' . . . caused by an 'occurrence.'"[3] (*E.g.* Am. Compl., Ex. A, Pt. 1 at 8-12.)

---

[2] Defendant Federal Insurance Co. ("Federal") is an Indiana corporation with its principal place of business in New Jersey. (Am. Compl. ¶ 6.) Federal has not filed any briefing related to the instant motion, which only deals with Donaldson's claims against AIG.

[3] The policy defines "property damage" as:

    a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Am. Compl., Ex. A, Pt. 1 at 19.) The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 18.)

The CGL policies also contain a Batch Clause Endorsement, which combines certain property damage that might otherwise be subject to separate deductibles into one "occurrence." The Clause states:

> As respects "Products Completed Operations Hazard"[4] all . . . "property damage" arising out of and attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting one lot of goods or products manufactured, sold, handled or distributed by you or others trading under your name, shall be deemed to result from a single "occurrence." Such "occurrence" will be deemed to occur with the first injury notified to you during the policy period.

(*E.g.*, Am. Compl., Ex. A, Pt. 2 at 28.)

In addition to the CGL policies and other insurance policies not relevant to the instant motion, National Union issued two consecutive annual commercial umbrella liability policies to Donaldson from July 31, 2000 to July 31, 2002. (*See* Decl. of Cody S. Moon ("Moon Decl."), Ex. 16 at 19, Oct. 28, 2016, Docket No. 462.) The National Union umbrella policies do not contain a batch clause endorsement, nor do they contain "follow-form" language.[5]

---

[4] "Products-completed operations hazards" is defined as "'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except (1) Products that are still in your physical possession; or (2) Work that has not yet been completed or abandoned." (Am. Compl., Ex. A, Pt. 1 at 18.)

[5] An excess insurance policy follows the form of an underlying insurance policy when the excess policy includes language stating that it follows the same terms as the underlying policy, including definitions, conditions, exclusions and, as relevant to the case at hand, endorsements. *See, e.g.*, *Cargill, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. A03-187, 2004 WL 51671, at *6 (Minn. Ct. App. Jan. 13, 2004) (explaining what a "follow-form" insurance policy is).

## III. THE UNDERLYING LIABILITY LITIGATION

### A. *Arender* and Related Litigation

Throughout the 1990s, Donaldson designed and manufactured plastic air-intake ducts for logging and construction trucks manufactured and sold by Western Star Trucks ("Western Star"). *Donaldson I*, 2012 WL 1072329, at *1. On January 5, 2000, a Western Star representative notified Donaldson that air ducts in Western Star trucks were malfunctioning because of a defect that in some instances caused engine failure. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Donaldson Co.* (*Donaldson II*), No. 10-4948, 2015 WL 1292561, at *2 (D. Minn. Mar. 23, 2015). Starting in 2001, various purchasers of Western Star trucks filed actions against Donaldson because of the defect. *Id.* at *1.

In one such lawsuit, fifteen purchasers of Western Star trucks filed a case, *Otho Arender v. Burroughs Diesel, Inc.,* on November 8, 2001, in Mississippi state court against Burroughs Diesel, Inc. ("Burroughs"), Donaldson, and Western Star, alleging that the Western Star trucks they purchased were inoperable. *Id.* Burroughs, a commercial dealer of Western Star trucks, filed a cross-claim against Donaldson (the "*Burroughs* cross-claim") alleging the premature failure of engines was due to the defective air-intake ducts. *Id.*

## B. AIG Provides a Defense Subject to a Reservation of Rights

Donaldson notified American Home of the cases regarding the defective ducts shortly after they were filed.[6] On December 17, 2001, AIG's third-party claims administrator, Gallagher Bassett Services, Inc. ("Gallagher Basset"), retained attorney Kenneth Perry at the law firm Shell Buford to defend Donaldson in the *Arender* lawsuit. (*See* Moon Decl., Exs. 2-3.) Gallagher Bassett also provided Donaldson with a list of AIG's approved panel counsel; the document listed attorney by name, firm, and practice area. (*Id.*, Ex. 5.) Donaldson rejected Perry's representation and opted to find its own counsel licensed in both Mississippi and Alabama.[7] (*Id.*, Ex. 3.) Donaldson selected Robert A. Miller from the law firm Butler Snow. (*Id.*, Ex. 4.) The Butler Snow law firm was on the list of approved panel counsel, but only for employment and not for casualty work in Mississippi, while Miller was not specifically on the list at all.[8] (*Id.*, Ex. 5 at 5.) Regardless of the discrepancy, AIG approved Donaldson's retention of Miller and paid for Donaldson's legal fees during the *Arender* litigation. *Donaldson I*, 2012 WL 1072329, at *4.

---

[6] There is no dispute that the damages sought in the defective-duct litigation, including the *Arender* lawsuit and the *Burroughs* cross-claim, represent "property damage" as defined in the CGL policies.

[7] There was also at least one lawsuit similar to the *Arender* action filed against Donaldson in Alabama.

[8] At the time, Donaldson's in-house counsel, Amy Becker, communicated to Gallagher Bassett that Butler Snow was "on the list of AIG approved firms for Mississippi." (Moon Decl., Ex. 4.) At a deposition, Becker acknowledged that Miller was not on the list of AIG-approved panel attorneys and stated that she became aware of Miller and made the decision to hire him after she "did some research and came up with somebody who has got a good reputation for defending products cases." (*Id.*, Ex. 6 at 200:21-201:24.)

On March 11, 2002, AIG's claims administrator sent a letter regarding the faulty duct lawsuits to Gallagher Bassett, copying Donaldson, which stated:

> [Due to the] Batch Clause Endorsement . . . all claims related to alleged faulty air intake systems on Western Star trucks would fall under one occurrence. All the claims are subject to one deductible, and the limits of insurance for this occurrence are $1,000,000 . . . . Per the Batch Clause Endorsement, we have created a date of loss of November 14, 2001, the date on the first summons received by the insured.

*Id.*

On May 28, 2002, AIG sent Donaldson a reservation of rights letter, stating that AIG would defend Donaldson in the *Arender* litigation pursuant to the 2001-2002 CGL Policy. (Moon Decl., Ex. 7 at 5.) The letter contained a broad reservation of rights, including the right "to decline coverage . . . should there be a future determination that there is no potential for coverage." (*Id.*)

On June 9, 2003, National Union's claims administrator sent a letter to Donaldson purporting to reserve its rights related to the National Union umbrella policy in effect beginning July 31, 2001. (Moon Decl., Ex. 8.) The letter broadly reserved National Union's rights as to the faulty air duct lawsuits. (*Id.* at 8.) The letter also stated:

> There is only one occurrence where there is but one proximate, uninterrupted and continuing cause which results in all the injuries and damage, even though several discrete items of damage resulted. Moreover, when property damage is the result of a latent defect which subsequently becomes manifest, property damage is deemed to have occurred at the time of the injury not at the time of the negligent act. The first date of injury alleged in the *Arender* Complaint occurred on or about September 1, 2000. The *Bonner* Complaint alleges that injury occurred on April 17, 2001. Accordingly, the injuries alleged in both Complaints manifested prior to the inception of the National Union policy. National Union, therefore, reserves its rights to deny coverage for damage that did not occur during the policy period.

(*Id.* at 5.)

## C. *Burroughs* Cross-Claim Litigation

The underlying liability claims against Donaldson by purchasers of Western Star trucks eventually settled, with Donaldson making payments totaling $214,408.56 to the settling plaintiffs. *Donaldson I*, 2012 WL 1072329, at *2; (Joint Stipulation at 1-2, May 18, 2015, Docket No. 376). By March 2008, the only outstanding action against Donaldson was the *Burroughs* cross-claim. *See Donaldson I*, 2012 WL 1072329, at *2.

In early 2009, the state court scheduled a mediation regarding the *Burroughs* cross-claim for October 15, 2009. *Id.* at *5. On July 23, 2009, Donaldson advised AIG's attorney of the mediation and explained that the *Burroughs* cross-claim was in the early stages of discovery. (Moon Decl., Ex. 10.) In response to AIG's request for information about the case, Donaldson's counsel advised AIG that under Mississippi law, *Moeller v. Am. Guarantee & Liab. Ins. Co.*, 707 So. 2d 1062 (Miss. 1996), defense counsel for an insured is "not permitted to provide any recommendation or advice with respect to settlement to an insurer if there is a reservation of rights." (Moon Decl., Ex. 10 at 1; *see also id.*, Ex. 15 (similar communication in September 2009).) However, between July and September 2009, Donaldson decided to provide AIG with some documents related to the *Burroughs* cross-claim litigation. *Donaldson I*, 2012 WL 1072329, at *4.[9]

According to AIG, as a result of the various pieces of information Donaldson provided starting in July 2009, AIG learned for the first time that Donaldson received notice of the damage that was the subject of the underlying litigation in January 2000, as

_____

[9] Additionally, with Donaldson's consent, on October 2, 2009, Butler Snow provided its evaluation of the *Burroughs* cross-claim – in which Butler Snow recommended settlement around $6.6 million – to AIG. (Moon Decl., Ex. 17 at 11.)

opposed to first learning about the damage at the time the *Arender* lawsuit was filed, in November 2001. On September 2, 2009, AIG sent Donaldson new reservation-of-rights letters. (Moon Decl., Ex. 16.) For the first time, the letters reserved AIG's rights specifically regarding the *Burroughs* cross-claim. The letters referred to the CGL policies issued for all six policy years (spanning July 1996-July 2002). (*Id.* at 3-18.) In the letters, AIG also reserved its rights with respect to the *Burroughs* cross-claim under the National Union umbrella policies issued between July 2001 and July 2003. (*Id.* at 19-32.) The letters discussed the policies' deductible requirement. (*Id.* at 5, 21.) As with the initial reservations of rights, these updated letters contained broad language reserving all of AIG's rights under the policies. (*Id.* at 5, 8-9, 24-25.) Unlike the initial reservation of rights, the updated versions advised that "[i]f you wish to have your own personal counsel become involved in this matter, at your own expense, please feel free to do so, and we will cooperate fully with such counsel." (*E.g.*, *id.* at 9.)

The parties in the *Burroughs* litigation failed to resolve the cross-claim during mediation in October 2009. According to Donaldson, the "mediation failed, in large part due to [AIG's] refusal to offer realistic sums to the *Burroughs* plaintiff to settle the case." *Donaldson I*, 2012 WL 1072329, at *5.

On December 29, 2009, and January 21, 2010, AIG further supplemented its coverage position with respect to the *Burroughs* cross-claim. *Id.* In the December 2009 letter, AIG explained in more detail the requirement that Donaldson pay a $500,000 deductible per policy year before CGL coverage would kick in under each annual policy between July 31, 1996 and July 31, 2002. (Decl. of Matthew J. Fink, Ex. R at 6, June 1, 2011, Docket No. 32.) AIG also explained that it was of the understanding that there

were at least three "lot[s]" of defective products and explicitly reserved "the right to assert that Burroughs' [cross-claim] involves multiple occurrences implicating multiple deductible limits under each applicable policy." (*Id.*) In the January 2010 letter, AIG requested for the first time that Donaldson pay five additional deductibles (totaling $2.5 million), equal to one deductible per policy year.[10] (*Id.*, Ex. S at 3-4.) Donaldson argues that AIG's new demand for additional deductibles, on the eve of mediation, was an attempt to coerce Donaldson into contributing more than it was contractually required to contribute to the settlement of the *Burroughs* cross-claim.

On February 22, 2010, the Burroughs cross-claim settled for $6 million. *Donaldson I*, 2012 WL 1072329, at *5. AIG contributed $3,548,387.10 toward the settlement and Federal contributed $2,451,612.90; Donaldson paid nothing. *Id.* On June 30, 2010, AIG sent Donaldson an invoice reiterating the demand for $2.5 million in deductibles. *Id.*

## IV. PROCEDURAL HISTORY

AIG initiated this action on December 21, 2010, (Compl., Dec. 21, 2010, Docket No. 1), and amended the complaint on June 28, 2011, (Am. Compl.). AIG alleged that it paid too much toward the *Burroughs* settlement, seeking $2.5 million from Donaldson under the theory that there was one occurrence per policy year over six years, and

---

[10] The request for additional deductibles was based on AIG's interpretation of the Batch Clause Endorsement; under AIG's reading, that endorsement would be read to aggregate all damage relating to a single lot into one occurrence within a given policy year, but it would not aggregate all damage over multiple policy years into one occurrence.

therefore Donaldson (or Federal, as Donaldson's insurer) owed AIG reimbursement of one deductible per policy year. (*See* Am. Compl. ¶¶ 45-75.)

Donaldson filed three counterclaims against AIG. (Answer to Am. Compl. & Countercl. ("Answer") ¶¶ 81-170, Aug. 30, 2011, Docket No. 84.) Donaldson alleges that AIG breached the applicable insurance contracts and also breached the covenant of good faith and fair dealing.

On March 30, 2012, the Court issued an order interpreting the term "occurrence" in the CGL policies' Batch Clause Endorsement. *Donaldson I*, 2012 WL 1072329, at *12-14. Under that order, as long as all loss is attributable to one lot of goods, such loss counts as one "occurrence" even if the damage to the claimants occurred over multiple years. *Id.* at *12 ("The Court finds that [the] language [of the Batch Clause Endorsement] unambiguously combines property damage, including damage that may take place across multiple policy periods, into one 'occurrence' that takes place when Donaldson is notified of that damage."). This decision eviscerated AIG's position that it could demand one deductible per policy year from Donaldson under the Batch Clause Endorsement, but it left open the argument that AIG could collect one deductible per "lot" of goods and that there could have been more than one lot. In the same order, the Court also rejected Donaldson's argument that AIG should be estopped from denying that the Burroughs settlement constitutes damages related to only one "occurrence" under the 2001-2002 policy. *Id.* at *10.

In an order dated March 23, 2015, the Court found that Donaldson was first notified of the defect in the ducts in January 2000. *Donaldson II*, 2015 WL 1292561, at *12. The Court also determined that there were two separate "lots" of defective ducts,

and therefore, there were two separate "occurrences" under the 1999-2000 insurance policies. *Id.* at *9-12. In the same order, the Court denied AIG's motion for judgment on the pleadings regarding Donaldson's counterclaims. *Id.* at *5-9.

On October 28, 2016, AIG filed the instant motion for summary judgment on Donaldson's counterclaims. [11]

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court may order summary judgment if the

---

[11] In Count I of its counterclaims, Donaldson seeks a declaratory judgment that all damages alleged in the *Arender* case and the *Burroughs* cross-claim arose from one occurrence under the 2001-2002 CGL policy and the National Union Umbrella Policy, subject to a single $500,000 deductible, and therefore, AIG must indemnify Donaldson for all damages arising from that litigation and apply a single $500,000 deductible under the 2001-2002 policies. (Answer ¶¶ 155-58.) The parties agree that Count I of Donaldson's counterclaims is effectively resolved by a prior order – on March 23, 2015, the Court determined that the damages alleged in the *Arender/Burroughs* litigation arose from two separate occurrences and Donaldson received notification in January 2000, triggering the 1999-2000 CGL policy as opposed to the 2001-2002 CGL policy. *Donaldson II*, 2015 WL 1292561, at *12. Thus, the Court will grant AIG's motion as to Count I.

nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009).

## II.    BREACH OF CONTRACT (COUNT II)

The core of Donaldson's breach-of-contract claim is that AIG's act of suing Donaldson in this litigation to recover additional deductibles was a breach of contract.[12] (Answer ¶ 161 (alleging that AIG "breached its contract of insurance with Donaldson by . . . suing Donaldson to recover monies it paid for settlement of the *Burroughs* Cross-Claim by seeking to collect from Donaldson a deductible for each of the policies issued between 1996 and 2001, even though those policies do not apply").)  As damages,

---

[12] In addition, in Count II, Donaldson alleges that "[u]nder the terms of the Batch Clause Endorsement . . . [AIG] owes Donaldson a duty to treat all damages arising from the property damage caused by the allegedly faulty air-intake duct . . . as one occurrence under the 2001-2002 Policy and that National Union Umbrella Policy, and apply a single $500,000 deductible. (Answer ¶ 160.)  The Court previously interpreted the Batch Clause Endorsement to find that there were two separate occurrences falling under the 2000-2001 policy year.  The Court also rejected Donaldson's argument that AIG was estopped from seeking more than one deductible. Thus, the Court will grant AIG's motion as to this allegation in Count II.

Also in Count II, Donaldson alleges that AIG "breached its contract of insurance with Donaldson by refusing to completely indemnify Donaldson for the settlement of the *Burroughs* Cross-Claim under the 2001-2002 Policy."  (Answer ¶ 161.)  Other than attorney fees, discussed below, Donaldson does not provide evidence of any other items for which it is entitled to indemnification.

Donaldson seeks reimbursement for attorney fees it has incurred in this litigation and potentially also reimbursement for coverage counsel fees incurred prior to this litigation.

### A.  Attorney Fees Incurred in This Litigation

AIG argues that attorney fees incurred in a breach-of-contract action are not recoverable damages for breach of contract absent a rule or contractual provision making attorney fees recoverable.  *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000) ("[It is] a fundamental principle of law deeply ingrained in our common law jurisprudence . . . that each party bears his [or her] own attorney fees in the absence of a statutory or contractual exception.").  Because Donaldson cites no rule or contractual provision entitling it to attorney fees incurred during this lawsuit, AIG argues those fees are not recoverable as damages.  The Court agrees and will grant AIG's motion as to Donaldson's claim seeking attorney fees incurred in this litigation as breach-of-contract damages.[13]

### B.  Coverage Counsel Fees Incurred Prior to This Litigation

An insurer's duty to defend generally does not require an insurer to pay for coverage counsel, though Minnesota has carved out a narrow exception allowing recovery of attorney fees when an insurer breaches the duty to defend.  *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 422-25 (Minn. 2003) (citing *Morrison v.*

---

[13] Furthermore, it is well-established that as a general matter, filing a lawsuit in good faith to seek enforcement of a contract is not a breach of contract, and AIG also reserved its right to do so.  Donaldson has not indicated what contractual provision AIG has breached.  The parties also agree that AIG fulfilled its two central contractual duties – to provide a defense and to cover the cost of any judgment against Donaldson.  Thus, even if attorney fees were recoverable as damages, Donaldson's breach-of-contract claim would fail for the additional reason that Donaldson has not demonstrated that AIG breached a contractual duty.

*Swenson*, 142 N.W.2d 640, 644-47 (Minn. 1966)).  The record is clear that AIG did not breach the duty to defend – AIG paid Donaldson's legal fees in the underlying liability litigation.  Therefore, *Morrison* does not apply, so to the extent Donaldson argues that it is entitled to coverage counsel fees incurred prior to this litigation because of AIG's breach of contract, the argument fails as a matter of law.

## III.    BREACH OF COVENANT (COUNT III)

In Count III, Donaldson argues AIG breached the covenant of good faith and fair dealing by (1) changing its coverage position years into the underlying liability litigation and delaying disclosure of this changed position to Donaldson, (Answer ¶¶ 164-67), and (2) failing to advise Donaldson of the right to independent counsel and to provide independent counsel, (*id.* ¶ 168).[14]

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract."  *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)).  In other words, the covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary and unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the contract."  *Erickson v. Horing*, No. 02-138, 2002 WL 31163611, at *13 (Minn. Ct. App.

_____

[14] Count III also alleges that "[AIG] breached the duty of good faith and fair dealing by its failure to properly separate the claims handling responsibilities from individuals also involved in asserting [AIG]'s coverage positions."  (Answer ¶ 169.)  Donaldson did not brief this claim and it appears that Donaldson intends to abandon it; the Court will grant AIG's motion as to this portion of Count III.

Oct. 1, 2002) (quoting *Wilmington & N. R.R. Co. v. Del. Valley Ry. Co.*, No. 97C-09-297-WTQ, 1999 WL 463705, at *6 (Del. Super. Ct. Mar. 30, 1999)). "Actions are done in 'good faith when done honestly, whether it be negligently or not.'" *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (quoting Minn. Stat. § 520.01, subd. 6 (1996)). Conversely, actions are in bad faith when "a party's refusal to fulfill some duty or contractual obligation [is] based on an ulterior motive, not an honest mistake regarding one's rights or duties." *Id.* (citing *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 837 (Minn. Ct. App. 1994)).

### A. Change in AIG's Coverage Position

First, the Court addresses Donaldson's argument that AIG changed its coverage position and delayed notifying Donaldson of the change in bad faith. Donaldson alleges that it was AIG's position beginning in March 2002 (and up until early 2010) that the damages claimed in the *Arender* litigation, including the *Burroughs* cross-claim, fell under one occurrence under the 2001-2002 policy year, and thus Donaldson would owe AIG only one deductible. *See Donaldson I*, 2012 WL 1072329, at *4. According to Donaldson, AIG "promised" to seek only one deductible, then abruptly changed course years later by demanding additional deductibles in bad faith. (Answer ¶¶ 165-67.) Donaldson argues that even if it is not entitled to reimbursement of coverage counsel fees in general, the fact that AIG disclosed its true coverage position so late meant that Donaldson's coverage counsel fees were higher than they would have otherwise been had AIG acted in good faith because coverage counsel had to quickly get up to speed on years

of litigation. Thus, Donaldson argues that some portion of its coverage counsel fees is recoverable as damages for breach of the covenant of good faith.

As evidence of AIG's bad faith, Donaldson points the Court to internal AIG documents showing that AIG personnel were aware that there was a coverage gap between the 2001-2002 CGL policy, issued by American Home, and the 2001-2002 umbrella policy, issued by National Union. (*See* Aff. of Rikke Dierssen-Morice ("Dierssen-Morice Aff."), Ex. K, Jan. 29, 2016, Docket No. 425; *id.*, Ex. L; *id.*, Ex. P; *id.*, Ex. Q at 66; *id.*, Ex. S.) Because of this gap in coverage, if the damages were deemed to occur in the 2001-2002 policy year, Donaldson would have been responsible for multiple deductibles before the umbrella policy would kick in, because there was neither a Batch Clause Endorsement nor follow-form language in the umbrella policy. Donaldson's position is that AIG withheld this "secret" coverage position from Donaldson in bad faith. The parties disagree about whether AIG had a duty to inform Donaldson of this potential gap in coverage.

But even assuming there were such a duty, there is simply no evidence that AIG sought to exploit this allegedly "secret" coverage position. When arguing that Donaldson owed multiple deductibles in this lawsuit, AIG's analysis rested on its interpretation of the Batch Clause Endorsement in the CGL policies, **not** the disconnect between the CGL and umbrella policies. (*See* Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. at 13-30, June 1, 2011, Docket No. 31.) Additionally, Donaldson was on notice well before 2010 that there was the real potential for no coverage at all under the National Union umbrella policy. (*See* Moon Decl., Ex. 8 at 5 ("[T]he injuries alleged in both Complaints manifested prior to the inception of the National Union policy. National Union,

therefore, reserves its rights to deny coverage for damage that did not occur during the policy period.").)  Thus, it is simply not clear to what end AIG might have intentionally withheld this "secret" coverage position, and the Court rejects the notion that this issue gives rise to an inference of bad faith.  *See Lassen*, 514 N.W.2d at 837 (explaining that an action is taken in bad faith when a party's refusal to fulfill some duty is based on an ulterior motive).

Donaldson also argues that when AIG changed its coverage position in 2010, suddenly asserting for the first time that Donaldson might owe multiple deductibles, that change in position was arbitrary and in bad faith.  The Court agrees that AIG's communications in 2009 and 2010 were somewhat clumsy.[15]  But a mere change in coverage position when an insurer previously issued a reservation of rights, without more, is not evidence of bad faith.  Indeed, if the opposite were true, a reservation of rights would lose all effectiveness.  The parties' litigation over the proper interpretation of the Batch Clause Endorsement involved close issues of contract interpretation, and in the Court's view, AIG made reasonable, good-faith arguments, even though in the end AIG did not succeed on all of its original positions.

Because there is insufficient evidence of bad faith related to AIG's handling of Donaldson's claim, the Court will grant AIG's motion on Donaldson's counterclaim regarding this issue.

---

[15]  For example, the record shows that there was high turnover in AIG claims administrators working on Donaldson's case.  When AIG announced its new coverage position, one of the letters a new claims administrator sent to Donaldson stated, somewhat confusingly: "[AIG] recently became aware that each of the . . . CGL policies contain deductible endorsements in the amount of $500,000 per occurrence."  (Dierssen-Morice Aff., Ex. II at 74).

### B. Right to Independent Counsel

Donaldson argues that in the course of providing a defense to Donaldson in the *Arender* litigation and the *Burroughs* cross-claim, AIG breached the covenant of good faith and fair dealing as defined in Mississippi law. (*See* Answer ¶ 168.) Under Mississippi law, whenever an insurer provides a defense to an insured subject to a reservation of rights, there is a per se conflict of interest, and the insurer is obligated to inform the insured of the right to independent counsel and provide independent counsel. *Moeller* 707 So. 2d at 1069-70. In contrast, Minnesota courts have "declined to adopt a rule that assumes a conflict of interest arises when an insurer defends under a general reservation of rights." *C.H. Robinson Co. v. Zurich Am. Ins. Co.*, No. 02-4794, 2004 WL 2538468, at *5 (D. Minn. Nov. 5, 2004).

The Court must determine whether Mississippi or Minnesota law applies to this claim. Donaldson argues that because AIG provided a defense in the *Arender* litigation in Mississippi, Mississippi law supplies the duties applicable to AIG as insurer. Because AIG provided a defense subject to a reservation of rights, then under Donaldson's view, the Mississippi duties regarding conflicts of interest would apply. AIG argues, on the other hand, that Minnesota substantive law applies to interpret the contractual rights and duties of the parties to the relevant insurance contracts, and therefore, Donaldson's claim that AIG violated a duty imposed by Mississippi law must fail as a matter of law.

Minnesota's choice-of-law rules govern the Court's analysis. *Highwoods Props., Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 920 (8th Cir. 2005) ("In diversity cases, we apply the choice of law principles of the state in which the district court is located."). In

general, Minnesota applies a significant contacts test for choice-of law-analysis. *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93-94 (Minn. 2000).[16]

More specifically, the Minnesota Court of Appeals has held that when an insurance contract covering national risks does not contain a choice-of-law provision, "if any states are to be involved in a choice-of-law analysis, it should be . . . the home states of the parties to the litigation." *Cargill, Inc. v. Evanston Ins. Co.*, 642 N.W.2d 80, 89-90 (Minn. Ct. App. 2002); *see also Hawkins, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, No. A07-1529, 2008 WL 4552683, at *4 (Minn. Ct. App. Oct. 14, 2008) (same). This rule ensures predictability of results; otherwise, an insurer's duties to the insured would vary based solely on the forum in which a plaintiff sues the insured. "It strains credulity to believe that either party to [a] contract of insurance could have intended such a result." *Cargill*, 642 N.W.2d at 89.

Donaldson has not argued why any other factor in the significant contacts test weighs in favor of applying Mississippi law here, and the Court finds *Cargill*'s reasoning persuasive. Furthermore, Donaldson does not argue that there is a conflict between the laws of Minnesota and AIG's home state, so the Court will apply Minnesota substantive law. The Court will grant AIG's motion on this issue because under the applicable law,

---

[16] The significant contacts test consists of the following choice-influencing factors:

      (1) Predictability of results;

      (2) Maintenance of interstate and international order;

      (3) Simplification of the judicial task;

      (4) Advancement of the forum's governmental interest; and

      (5) Application of the better rule of law.

*Nodak*, 604 N.W.2d at 94.

the existence of a reservation of rights did not amount to a per se conflict of interest triggering a duty on AIG's part to notify Donaldson of the conflict and its right to independent counsel.[17]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment on Donaldson's Counterclaim [Docket No. 459] is **GRANTED**. Donaldson's Counterclaims are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 23, 2017 at Minneapolis, Minnesota.

_____s/John R. Tunheim_____
JOHN R. TUNHEIM
Chief Judge
United States District Court

---

[17] Even if Mississippi law did apply, it is unlikely that AIG materially breached the Mississippi covenant of good faith and fair dealing.  While AIG's initial reservation of rights did not advise Donaldson of the right to independent counsel, Donaldson rejected AIG's retained counsel and selected its own counsel, which AIG paid for.  (Moon Decl., Exs. 2-5.)  Donaldson's counsel from Butler Snow also refused to share information with AIG, believing that he was restrained by *Moeller*.  (*See id.*, Exs. 10, 15.)